TEXACO PUERTO RICO, INC.; The Shell Company (Puerto Rico) Ltd.; and Esso Standard Oil Co. (P.R.), Plaintiffs,

v.

Guillermo MOJICA MALDONADO, personally and in his official capacity as Secretary of the Department of Consumer Affairs of the Commonwealth of Puerto Rico, Defendant.

TEXACO PUERTO RICO, INC., Plaintiff,

v.

Guillermo MOJICA MALDONADO, as Secretary of the Department of Consumer Affairs, and the Department of Consumer Affairs of the Commonwealth of Puerto Rico, Defendants.

ESSO STANDARD OIL COMPANY (P.R.), Plaintiff,

v.

Guillermo MOJICA MALDONADO, as Secretary of the Department of Consumer Affairs, and the Department of Consumer Affairs of the Commonwealth of Puerto Rico, Defendants.

Civ. Nos. 89–1142 to 89–1144 (JAF), 92–2352 (JAF) and 92–2362 (JAF).

United States District Court, D. Puerto Rico.

Sept. 9, 1994.

Allan M. Grimaldi, Howrey & Simpon, Washington, DC, Rick P. Frazier, Coral Gables, FL, Timm A. Miller, White Plains, NY, William Estrella, San Juan, PR, for Texaco.

Rafael Perez–Bachs, Ana Matilde Nin, McConnell Valdes, San Juan, PR, for Shell.

Donald P. Craven, James P. Tuite, Miller & Chevalier, Chartered, Washington, DC, Luis Sanchez–Betances, Sanchez–Betances & Sifre, San Juan, PR, for Esso.

Lynn R. Coleman, Matthew W.S. Estes, Skadden Arps, Slate, Meaguer & Flom, Washington, DC, Maria Pabon, Roberto Ruiz–Comas, Federal Litigation Div., Commonwealth of Puerto Rico, San Juan, PR, for defendants.

## OPINION AND ORDER

FUSTE, District Judge.

Before the court is the request of the Puerto Rico Department of Consumer Affairs (DACO), requesting restitution from three gasoline wholesalers based on profits accrued during the pendency of an injunction issued by this court, which prohibited DACO from enforcing a regulation on gross profit margins earned by the wholesalers.[1]  A

---

1. A full history of this lengthy litigation can be found in the following cases: *Isla Petroleum Corp. v. Department of Consumer Affairs,* 640 F.Supp. 474 (D.P.R.1986); *Isla Petroleum Corp.*

three-week bench trial was held on the issue of restitution, and the testimony of several prior Secretaries of DACO, employees of the gasoline wholesalers, and many economic experts was presented. After a careful and detailed examination of the voluminous evidence, we find that DACO is not entitled to any restitution from the wholesalers.

DACO is an administrative agency created pursuant to Puerto Rico law; Iváv Ayala Cádiz is the current Secretary of DACO. The purpose of the agency is to "defend and implement the rights of the consumer, to restrain the inflationary trends; as well as the establishment and inspection of a price control over the goods and services for use and consumption." 3 L.P.R.A. § 341b. The three plaintiffs, Texaco Puerto Rico, Inc, The Shell Company (Puerto Rico) Limited, and Esso Standard Oil Company (P.R.), are corporations engaged in gasoline wholesaling in Puerto Rico, affiliated with major oil companies headquartered in the United States and England.

This court has jurisdiction to grant or deny restitution as part of the primary jurisdiction over the original litigation. *Atlantic Coast Line R.R. v. Florida,* 295 U.S. 301, 314, 55 S.Ct. 713, 718–19, 79 L.Ed. 1451 (1935).

## I.

### Facts

Unfortunately, the story that leads to the current dispute is neither short nor straightforward, but as the facts are essential to our disposition here, we recount them in some detail.

### A. Federal Regulation of Gasoline Prices

Between 1973 and 1981, gasoline prices in the United States, including Puerto Rico, were regulated at the federal level, pursuant to the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. § 751 et seq. Wholesale prices were controlled through the regulation of gross profit margins.[2] In 1975, in anticipation of the relinquishment of federal controls, DACO promulgated Price Regulation 45. Regulation 45 authorized the Secretary of DACO to regulate prices and profit margins on gasoline and other fuel products. The Regulation was amended in 1976 to provide that it would not become effective until the termination of federal controls. The amendment also provided that companies involved in the sale of oil products were required to inform DACO fifteen days prior to any increase in the price of the product. In 1981, federal regulation of gasoline was withdrawn, and the Amended Regulation 45 went into effect.

### B. DACO's Actions 1981—1986

Upon the termination of federal price control regulation on January 28, 1981, DACO did not immediately utilize its power to regulate prices and/or profit margins. Rather than entering any formal order, the agency followed a policy of monitoring the gross profit margins and prices of the gasoline industry. As a reference point, DACO informally adopted the federal levels of gross profit margin controls which existed upon deregulation in 1981. For the wholesalers, this figure was 8.6 cents per gallon.

Although ostensibly using the 8.6 figure as a guideline from 1981 until 1986, DACO took little action to actually enforce that level, in spite of the fact that the gross profit margins of Texaco, Esso, and Shell were generally above the level of 8.6 cents per gallon. For example, during 1984–1985, the profit margins of all wholesalers in Puerto Rico ranged from 6.9 to 16.76 cents per gallon, with the plaintiffs earning between 12.35 and 16.76

*v. Puerto Rico Dep't of Consumer Affairs,* 811 F.2d 1511 (Temp.Emer.Ct.App.1986); *Puerto Rico Dep't of Consumer Affairs v. Isla Petroleum Corp.,* 485 U.S. 495, 108 S.Ct. 1350, 99 L.Ed.2d 582 (1988); *Tenoco Oil Co. v. Department of Consumer Affairs,* 876 F.2d 1013 (1st Cir.1989); *Texaco Puerto Rico, Inc. v. Ocasio Rodríguez,* 749 F.Supp. 348, 373 (D.P.R.1990).

2. Gross profit margin is defined as the difference between a seller's sales price and the seller's acquisition cost. The acquisition cost includes the price of the gasoline plus excise taxes, but not operating costs. Therefore, the gross profit margin consists of operating expenses and any return on capital.

cents per gallon.[3] In addition, the fifteen-day notice requirement was not uniformly followed by the wholesalers or consistently enforced by DACO.

During September of 1985, the Secretary of DACO, Carlos J. López–Feliciano, sent a memorandum to the wholesalers, reminding them that Regulation 45 required a fifteen-day notice of any price increase, and that the wholesalers were being supervised so that they would not surpass the gross profit margin restriction of 8.6 cents per gallon, which was in existence back when federal regulations ended in 1981. The memo stated that the wholesalers could be subject to administrative sanctions if they failed to comply with Regulation No. 45.

Executives of the three wholesalers testified that although they received the memorandum, because there was no concrete price margin regulation in effect, and DACO was aware that actual margins were above those imposed by the federal government four years before that time, they did not attempt to adhere to the 8.6 cent margin limitation. Esso had communicated to DACO as early as 1982 that when federal regulations were terminated, Esso was not even regulated at the level of 8.6 cents per gallon, but was allowed to earn 10.2 cents per gallon, and that Esso's 1982 profit level of approximately 12 cents per gallon barely covered operating expenses.

In January 1986, soon after the 1985 memo was sent, DACO gathered data and held a hearing on whether to impose price controls in response to a request by the Gasoline Retailers' Association. The Association later withdrew the request and, although the investigation was completed, no controls were implemented at that time.

## C. Events of 1986

In early 1986, the world crude oil market experienced a sharp fall in prices. As a result, during the first quarter of 1986, the plaintiffs earned unprecedented profit margins, on the order of 20 to 30 cents per gallon.

In response to the fall in prices and concomitant increase in wholesale profit margins, the Puerto Rico Legislature introduced Law No. 5, of March 18, 1986, 13 L.P.R.A. § 4030(c), which imposed a new excise tax on oil and petroleum products. This new tax was in addition to a previously existing 16-cent per gallon excise tax. The purpose of the new tax was to capture some of the high wholesale profits resulting from the fall in oil prices for the Commonwealth treasury. The tax operates in such a way that the amount of the tax fluctuates and is inversely related to the price of crude oil. The result of the tax structure is that the lower the price of oil, the higher the tax, and vice versa. In order to avoid the political cost usually associated with tax increases, the government promised the public that the new tax would not result in an increase in the price of gasoline. At the time that the tax was being considered, the wholesale price of gasoline had begun falling in response to the decline in crude oil prices.

Before implementing the tax, high-level government officials, including the President of the Senate, Miguel Hernández Agosto, the Secretary of State, Héctor Luis Acevedo, the incumbent Secretary of DACO, Carlos López–Feliciano, and the incoming Secretary, Pedro Ortiz Alvarez, summoned executives of the three wholesalers to private meetings held at the office of the President of the Senate. At these meetings, the wholesalers were warned that they should cooperate with the government in the implementation of the new tax by refraining from further lowering gas prices, so that the government could achieve revenue from the tax without the consumers seeing any increase in price. In this manner, the wholesalers would be able to earn reasonable profit margins, the public would not face a price increase, and the government could earn revenue. One of the wholesaler's witnesses, José Luis Blanco, testified that at the meeting he attended on behalf of Esso, the Secretary of State threatened that a lack of cooperation by the wholesalers could have negative repercussions. At

---

**3.** In 1985, there were nine wholesalers operating in Puerto Rico: Texaco, Esso, Shell/Mobil, Isla Petroleum Corporation, Cía. Petrolera Caribe, Inc., Caribbean Gulf Refining Corporation, Tenoco Oil Company, Inc., and Distribuidora de Gasolina El Coquí, Inc.

trial Blanco testified as to his response to the meeting:

I really lost faith in Government. For the first time I saw a Government that did not really care about the consumer, because, you know, the prices were coming down. The consumer would certainly benefit from it but here the Government or that administration was pursuing a different factor. They wanted to implement a tax and the consumer was expendable.

*Transcript of Proceedings,* Vol. 16 at 27. In response to the veiled threats, some decreases in price anticipated by the wholesalers before these meetings were not implemented.

In order to enforce the new excise tax, DACO issued an order on April 23, 1986, which (1) forbade wholesalers from passing on the cost of the tax to retailers, and (2) froze wholesale and retail prices at their levels on March 31, 1986. Soon after this order was implemented, the world oil market rebounded, and prices began to rise. As a result, several of the wholesalers were faced with the untenable position of selling gasoline at prices below acquisition cost. Representatives of the wholesalers met with Secretary Ortiz during this juncture in order to request some sort of relief. Ortiz assured them that the situation was temporary, and that DACO wanted to return to a free market, but explained that the tax created a political problem which had to be dealt with at that time. He urged the wholesalers to be patient and absorb the loss until DACO could ease the situation. Ultimately, however, Ortiz informed the wholesalers that he would not be able to offer them any assistance with the situation, and suggested that they resort to the legal system. Eight of the wholesalers sought relief in federal district court, claiming violations of the U.S. Constitution and local law.

On May 20, immediately prior to the scheduled trial regarding the April 23 order, DACO issued a new order, rescinding the price freeze and setting profit margins for the wholesalers at levels of either 8.6 cents or 3.6 cents per gallon. The order provided that all wholesalers whose average gross margins in 1986 had not exceeded 8.6 cents per gallon could continue at that level. Those whose margins had been greater than 8.6, including Esso, Texaco, and Shell, were restricted to the level of 3.6 cents/gallon until they reached an average for the year of 8.6, at which point they could return to the 8.6 level.

The focus of the 1986 trial in this court then turned to the new regulation. We found that gasoline regulation by DACO was preempted under the federal policy of deregulation, and that the May 20 order violated the Due Process and the Takings Clauses of the U.S. Constitution. *Isla Petroleum Corp. v. Department of Consumer Affairs,* 640 F.Supp. 474 (D.P.R.1986).[4] As a result, we issued a permanent injunction invalidating DACO's previous regulations and prohibiting any future implementation of "orders fixing prices or margins of profit in the gasoline wholesale and retail business...." *Id.* at 515. Although DACO unsuccessfully filed for a stay of the injunction both in this court and later with the First Circuit, at no point did DACO request a bond from the wholesalers, or that a fund be set up to collect any profits received by the wholesalers in excess of the amount allowed under the enjoined regulation.

## D. *The Injunction*

Due to the nature of the injunction, a bifurcated appeal followed, with the issue of federal preemption sent to the Temporary Emergency Court of Appeals, and the constitutional issues appealed to the First Circuit, which stayed review pending determination of preemption. Meanwhile, the price of crude oil had stabilized by the summer of 1986. The profit margins of the wholesalers returned to approximately the levels of 1984–1985, where they remained throughout the

---

**4.** The findings of fact established as part of our 1986 opinion were not modified on appeal and thus are still valid today, and to a certain extent form the law of the case for this proceeding. *Cf.*

*United States v. Rivera–Martínez,* 931 F.2d 148, 150 (1st Cir.); *cert. denied,* —— U.S. ——, 112 S.Ct. 184, 116 L.Ed.2d 145 (1991).

period of the injunction.[5] On December 29, 1986, the Temporary Emergency Court of Appeals upheld the finding of federal preemption. *Isla Petroleum Corp. v. Puerto Rico Dep't of Consumer Affairs*, 811 F.2d 1511 (Temp.Emer.Ct.App.1986). The Supreme Court then granted certiorari and reversed, holding that federal deregulation did not preempt state regulation of gasoline prices. *Puerto Rico Dep't of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, 108 S.Ct. 1350, 99 L.Ed.2d 582 (1988).

Although the May 20 order remained enjoined, the Supreme Court decision removed any preemption impediment to regulation of the wholesalers by DACO. Therefore, at this juncture, although DACO could not enforce the May 20 order, the agency was free to promulgate a new regulation. Accordingly, DACO embarked on an information-gathering expedition, collecting detailed data from the wholesalers and holding a public hearing on the issue of whether to establish regulations of gross profit margins at the wholesale and retail level.

Soon after the Supreme Court decision, DACO sent a Report on Gasoline Prices in Puerto Rico to the Office of the Governor. In explaining the background regarding DACO regulation, the report noted that

[the injunction] did not produce significant increases because simultaneously the price of gasoline in the free market began to decrease. The profit margin for wholesalers was established during the major part of these 2 years at between 12 and 17 cents, which is a level similar to that existing prior to the reduction in the price of crude.

*April 20, 1988 Memorandum from Pedro Ortiz Alvarez, Secretary of DACO to the Hon. Rafael Hernández Colón, Governor of Puerto Rico.*

This report contained various potential options for proceeding: A profit margin control, a price freeze, a system of monitoring prices, and a profit margin control combined with an order to balance margins, in order to recoup any excesses earned during the injunction. The document also noted that DACO's position following the Supreme Court decision was that regulation was warranted only when profit margins were unreasonable or excessive. The report informed the Governor's office about DACO's implementation of a communication strategy which included press releases, interviews by the Secretary, and press conferences. To avoid public confusion, the Secretary was declared to be the sole spokesperson for DACO.[6]

The momentum from DACO's Supreme Court victory caused some politicians to call for a gasoline price freeze. Secretary Ortiz responded, via a press interview on May 19, 1988, that a price freeze would not be implemented because of its possible negative repercussions, but that the agency was collecting information in order to determine whether to institute margin controls, which he estimated could be between 13 and 14 cents per gallon. In August of 1988, DACO announced public hearings to consider establishing price control mechanisms on gasoline, utilizing regulation of gross profit margins per gallon at the wholesale and retail levels. No mention was made in the announcement about the possibility of a price freeze. That same month, Secretary Ortiz stated during a radio interview that DACO had not yet regulated the wholesalers because he was convinced that wholesale profits were at the levels of 1983 to 1984, and that retailers were in real competition.

During this time, Secretary Ortiz also met privately with representatives of the wholesalers. In these informal meetings, according to the testimony of the executives, Ortiz

---

**5.** According to DACO, the three plaintiffs earned the following margins from January 1, 1986 until the injunction was vacated in June, 1989:

|  | 1986 | 1987 | 1988 | 1/89–6/89 |
|---|---|---|---|---|
| Esso: | 14.6 | 16.8 | 16.4 | 16.0 |
| Shell: | 14.5 | 16.6 | 17.4 | 16.5 |
| Texaco: | 19.1 | 17.8 | 17.5 | 18.2 |

**6.** During the trial, the parties relied heavily on contemporaneous newspaper articles by actors

involved in the gasoline price regulation. Witnesses were confronted with the articles in order to show their knowledge or opinions at the time of the articles. Although these articles were stipulated for this limited purpose, the witnesses generally did not disagree that the articles contained fair representations of their statements at the time.

stated that DACO desired to have a free market system. Charles S. Griffith, Esso's General Manager during this period, testified that Ortiz told him that the margins being earned by Esso, which were in the 15–cent range, were not excessive. Shell's managing director at the time, Francisco Forteza, testified that he was told by Ortiz that profits by Shell in the 14 to 16–cent range were acceptable. However, Mr. Ortiz also stated during these meetings that he was not the final arbiter of regulation, and that Governor Rafael Hernández Colón was in favor of controls.

Texaco's president, Arnaldo Quirós, testified that during a meeting with the Secretary, he told Ortiz that the continuation of Texaco's investments in Puerto Rico was contingent upon the ability to earn about 17–18 cents per gallon profit margin. According to Quirós, Ortiz was pleased to hear about Texaco's investment, and encouraged its continuation.

In December of 1988, several months after the public hearings regarding the possibility of setting maximum profit margins on the sales of gasoline, Charles Griffith, of Esso, again met privately with Ortiz. Griffith testified that at this meeting, Ortiz told Griffith that after completing the study of the gasoline market, DACO had found that the market was behaving properly and that no regulation was necessary. Instead, DACO would continue to monitor prices. Griffith testified that based upon Ortiz' assurances, Esso lifted a freeze on non-mandatory investments in Puerto Rico.

On December 24, 1988, an article in a local newspaper, *El Nuevo Día,* stated that DACO had decided not to regulate gasoline prices, but rather to utilize "close supervision" of the wholesalers. The article quoted Ortiz as explaining that DACO had "adopted the theory of watching the movement of the market without adopting regulations so that the market can move agilely." The article also reported that Ortiz said that this monitoring mechanism had been used for the previous eight months, and during that time "there ha[d] not been a situation of excessive profits." An article in another newspaper, *El Mundo,* on December 26, contained essentially the same information as the *El Nuevo Día* story.

As of January 2, 1989, when Ortiz left office, no profit margin regulation had been promulgated. DACO did, however, amend Regulation No. 45 in order to repeal the fifteen-day notice on price increases, replacing it with a less stringent periodic reporting requirement.

### E. *Events Following Vacation of the Injunction*

On June 2, 1989, the First Circuit reached a decision in DACO's appeal. The court found that the while the May 20 margin regulation rested on a "sketchy economic basis," the order was not yet ripe for constitutional adjudication, given the availability of unutilized administrative review procedures. *Tenoco Oil Co. v. Department of Consumer Affairs,* 876 F.2d 1013, 1022 (1st Cir.1989). Based on this finding, the injunction was vacated. In reaching its conclusion that the issue was not ripe for adjudication, the First Circuit was unaware of any intent on the part of DACO to seek refunds for the period of the injunction. The day after the injunction was vacated, DACO issued an Interim Order, requiring the wholesalers to limit their gross profit margins to 11 cents per gallon. This order also set a date for public hearings to consider, among other issues, whether DACO should continue to regulate the gasoline market, and whether the wholesalers should be required to pay refunds for the excess amounts charged during the injunction's existence.

Following a number of other machinations, including attempts by the wholesalers to challenge the Interim Order at the administrative level, in local court, and before this court, in November 1989, DACO promulgated a final regulation, restricting the wholesalers to a 13–cents–per–gallon gross profit margin. Confronting a constitutional challenge to this regulation, this court found that the 13 cents limit "barely survived a broadside attack...." *Texaco Puerto Rico, Inc. v. Ocasio Rodríguez,* 749 F.Supp. 348, 373 (D.P.R.1990). The 13–cent regulation also withstood a challenge under Puerto Rico law. *Texaco Puerto Rico, Inc. v. DACO,* Civ. Nos.

KAC 90–0546, *et al.* (Superior Court of Puerto Rico, San Juan Part, Nov. 14, 1993), *aff'd,* No. CE–93–780 (Supreme Court of Puerto Rico, March 4, 1994).

The final gross profit regulation stated that

[u]nder consideration is whether the wholesalers should be required to pay back the overprice charged in the period falling between June 4, 1986 through June 27, 1989. DACO has not yet arrived at a final finding in relation to whether said repayment will, in effect, be required or not or concerning the amount that should potentially be returned. This aspect will be considered in a separate proceeding.

Ruling and Order to Set Gross Profit Margins and Prices in the Sale of Gasoline in Puerto Rico (November 30, 1989).

About six months later, in April 1990, DACO sent letters to Esso, Shell, and Texaco, containing preliminary views on the refund issue. The letters suggested the possibility of utilizing an 8.6–cents–per–gallon measure to calculate the amount of refunds, and requested input from the wholesalers. Each of the wholesalers responded to the letters, stating their objections and maintaining that they were willing to meet with DACO regarding the refund issue at any time. Neither the wholesalers nor DACO took the initiative in scheduling meetings in order to discuss the issue of refunds.

In January of 1991, Luis Roberto Piñero became the Secretary of DACO. During his tenure, there were a series of meetings between members of the Governor's staff and DACO regarding the issue of refunds. During that time, Piñero received instructions from the Governor that DACO should proceed on obtaining refunds. Piñero testified that although there was a proposal to request refunds based on the 8.6–cents–per–gallon figure, he rejected such a measure as improper. Piñero left DACO in February 1992, without acting on the refund issue, and was succeeded by Guillermo Mojica Maldonado. Upon his arrival at DACO, Mojica was given a draft of a remedial order which had been prepared by DACO's outside counsel, Skadden, Arps, Slate, Meagher & Flom, and translated into Spanish. The order was based on the 8.6–cent–per–gallon profit margin figure.

The next public mention of the refunds was on August 20, 1992, when Secretary Mojica held a press conference to announce that DACO would seek refunds of any profits greater than 8.6 cents per gallon earned by the three plaintiff wholesalers during the injunction period. The 8.6 figure was utilized against the recommendation of DACO staff, and without a review by the Secretary of the administrative record. Mojica testified at trial that he decided to use the 8.6 figure in part as a strategic measure. Mojica anticipated that the 8.6 cent refund order would stun the wholesalers and force them to negotiate a settlement. The wholesalers returned to this court to request an injunction of the Remedial Order issued by DACO. The Remedial Order issued by DACO in August 1992 was essentially the same document that had been drafted by Skadden Arps.

The agency later backed away from the 8.6 cent figure, releasing a Revised Remedial Order in October 1992, which allowed the wholesalers to choose between a refund calculation based on a 13–cents–per–gallon profit margin, or the margin necessary to achieve, for each year, a return on assets equal to the average return on assets for the electric utility industry plus one percentage point.

While DACO and the wholesalers were squabbling over refunds, a new government was elected in Puerto Rico. In order to evaluate the ramifications of the change in the government, the parties agreed to dismiss the wholesalers' case without prejudice, and to stay any further court action until the new administration had an opportunity to evaluate the situation. Apparently, the change in administration did not change DACO's resolve to obtain refunds; on April 1, 1993, DACO rescinded its Amended Remedial Order, moved to reopen proceedings before this court, and filed a Motion for Restitution from Esso, Shell, and Texaco. Depending on the methodology utilized, this motion requested restitution of between approximately $31 million and $37 million from Esso, between $13 million and $29 million

from Shell, and between $50 million and $71 million from Texaco, plus interest.

We finally arrive at the current controversy. DACO requests us to order the wholesalers to remit the difference between the gross profit margins which they actually earned while the injunction was in place, and an amount corresponding to what they might have earned if DACO was allowed to regulate during the period of the injunction.[7]

## II.

### Applicable Law

■ DACO's request for restitution rests upon "the principle, long established and of general application, that a party against whom an erroneous judgment or decree has been carried into effect is entitled, in the event of a reversal, to be restored by his adversary to that which he has lost thereby." *Arkadelphia Milling Co. v. St. Louis S.R. Co.*, 249 U.S. 134, 145, 39 S.Ct. 237, 242, 63 L.Ed. 517 (1919). The general principle of restitution provides that "[a] person who has conferred a benefit upon another in compliance with a judgment, or whose property has been taken thereunder, is entitled to restitution if the judgment is reversed, or set aside, unless restitution would be inequitable." Restatement of Restitution § 74 (1937). Thus, there are two inquiries to be made when restitution is requested: (1) whether a benefit was conferred due to the reversed judgment, and (2) whether restitution would be equitable.

, ■ Of course, as the wholesalers have emphasized, restitution is not an automatic remedy, but rather is discretionary, and the court has the "authority to direct restitution in an amount less than the whole sum [requested] ... or to deny it altogether, if compelling equitable considerations so dictate." *Williams v. Washington Metropolitan Area Transit Com.*, 415 F.2d 922, 944 (D.C.Cir. 1968), *cert. denied*, 393 U.S. 1081, 89 S.Ct. 860, 21 L.Ed.2d 773 (1969). Restitution is different from other remedies because "[t]he

question no longer is whether the law would put [the party] in possession of the money if the transaction were a new one. The question is whether the law will take it out of his possession after he has been able to collect it." *Atlantic Coast Line*, 295 U.S. at 310, 55 S.Ct. at 716–17.

The decision of whether restitution is in order is necessarily very fact-specific. Nevertheless, the parties have attempted to draw a few generalities from prior case law. DACO argues that courts have universally found restitution equitable when a party has charged more than the rate set by an enjoined regulation, and the regulation is ultimately found to be lawful, citing *United States v. Morgan*, 307 U.S. 183, 59 S.Ct. 795, 83 L.Ed. 1211 (1939); *Democratic Cent. Committee v. Washington Metro. Area Transit Comm'n*, 485 F.2d 786 (D.C.Cir.1973), *cert. denied*, 415 U.S. 935, 94 S.Ct. 1451, 39 L.Ed.2d 493 (1974); and *Williams v. Washington Metropolitan Area Transit Com.*, 415 F.2d at 922.

However, even if the cases support such a generality, we find it inapplicable to the instant situation, because the 8.6–cent rate was never found to be lawful. This court found the rate unconstitutional, and the First Circuit, while expressing skepticism about the basis for the 8.6/3.6–cent figure, found that the constitutional issue was not yet ripe for adjudication. DACO itself admits that it cannot request restitution based on the enjoined May 20, 8.6–cent order, but rather requests relief based on the 13–cent margin contained in the 1989 regulation, which ultimately passed constitutional scrutiny, or on the basis of two possible alternative calculations.

In contrast to a situation where it is clear that an injunction prohibited an agency from enforcing a substantively valid regulation, in this case, while the 13–cent/gallon gross profit margin regulation was upheld in 1990, that order was not the order which was enjoined in 1986. Therefore, in order to show that the wholesalers obtained a benefit from the in-

---

**7.** DACO has set forth three possible measures for restitution: A 13 cents/gallon gross profit, the average return for utilities plus one percent, and a 10% return on assets. DACO argues that any of these measures would be reasonable, but their economic expert, Dr. Logan, recommends the 13–cent figure as the most reasonable.

junction, DACO must prove that, had no injunction been in place, the agency would have regulated, at a level of 13 cents per gallon or less.

█ The wholesalers also have attempted to distill a general rule from the case law dealing with restitution, arguing that as part of the burden of proof to obtain restitution, DACO must prove that the profit margins actually earned by the wholesalers were not within a "zone of reasonableness," citing *Atlantic Coast Line*, 295 U.S. at 317, 55 S.Ct. at 720, and *Moss v. Civil Aeronautics Board*, 521 F.2d 298 (D.C.Cir.1975), *cert. denied*, 424 U.S. 966, 96 S.Ct. 1460, 47 L.Ed.2d 732 (1976).

DACO responds that there is no need for the agency to make such a showing, because even if the actual profits were reasonable, DACO could still have regulated the wholesalers at a lower, albeit reasonable rate, and would have done so if there had been no injunction. In other words, even if a 17–cent–per–gallon profit was reasonable in 1987, a 13–cent–per–gallon profit would also have been reasonable, given our imprimatur of the rate in 1990, and DACO could have chosen to regulate at that rate. Therefore, DACO disputes the relevance of the reasonableness of the actual margins.

As DACO has contended, the cases cited by the wholesalers discuss the reasonableness of a rate set by an administrative agency in order to determine whether restitution would be appropriate. In *Moss* and *Atlantic Coast Line*, after regulated entities charged rates set by an agency, the agency action was deemed unlawful based on procedural faults. However, in each case a regulation with substantially the same rate was later enforced by the agency. In order to obtain restitution, the plaintiffs, who had paid the rate set by the agency while the invalidated order was in effect, would have had to prove that the procedurally deficient order contained an unreasonable rate, especially in light of the fact that the regulated entities had little choice but to follow the agency directive. However, since the reasonableness of the original rate was confirmed by later agency action, it was equitable to deny restitution. As Justice Cardozo held,

[t]he rates now recognized as just are not a fabrication of judges. They have not been fixed by a court to take effect thereafter. They are the rates prescribed for the future by the appointed administrative agency, and that on two occasions, after scrutiny and study of injustice suffered in the past.

*Atlantic Coast Line*, 295 U.S. at 316, 55 S.Ct. at 719.

We discern a different situation in this case, where the actual profits earned by the wholesalers during the injunction were never the subject of a reasonableness analysis by DACO, and the wholesalers were not relying on a presumptively valid agency regulation in earning the disputed profits.

While we agree with DACO that there is no need for the agency to show that the actual margins were unreasonable, we do think that the amount of the profits, relative to amounts allowed by DACO in the past, may be considered as an equitable factor in determining the propriety of restitution. While, of course, we do not think that it is the proper role of the court to place our judgment of the reasonableness of the profits actually earned in place of what DACO may have considered was appropriate if allowed to regulate, we do think that the amount of profits actually earned is related to the showing required by DACO that "the money was received in such circumstances that the possessor will give offense to equity and good conscience if permitted to retain it." *Atlantic Coast Line*, 295 U.S. at 309, 55 S.Ct. at 716.

Therefore, for the purpose of determining whether the profits earned during the existence of the injunction were so high that equity compels restitution, we may examine the evidence presented regarding the competitiveness of the wholesale market in Puerto Rico and the reasonableness of the profits earned during the injunction in comparison to other periods when DACO could have, but chose not to, regulate. In addition, we may compare the economic analysis to Secretary Ortiz' stated policy of regulating only unreasonable or excessive profits.

While the above discussion illuminates the difficulty of attempting to create specific guidelines for the determination of whether to grant equitable relief, courts have identified certain factors which may be taken into account when deciding if such a remedy is proper. These factors include whether the party requesting relief unreasonably delayed in seeking the remedy,[8] *Thompson v. Washington,* 551 F.2d 1316, 1321–22 (D.C.Cir. 1977), whether that party acted in bad faith or with "unclean hands," *Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.,* 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945), whether the party from whom restitution is sought relied to its detriment on the actions of the agency, *Moss,* 521 F.2d at 314, and whether the remedy would serve the public interest, *United States v. Morgan,* 307 U.S. at 194, 59 S.Ct. at 801.

## III.

### *Analysis*

#### A. *Would DACO Have Regulated?*

■ DACO argues that had the injunction not been issued in 1986, the agency would have continued to regulate the market, although at a different rate. The wholesalers argue that long-term regulation was not planned in 1986. Rather, they contend that the enjoined regulation was only a response to the precipitous drop in world oil prices in 1986, and the political consequences of the new excise tax. Plaintiffs assert that as soon as the market stabilized, DACO would have returned to the pre–'86 practice of monitoring the market, while allowing free competition to reign.

#### 1. *DACO's Actions Prior to 1986*

The evidence of events prior to 1986 reveals little indication that DACO actually intended to enforce the 8.6–cent margins, or that DACO found the margins being earned by the wholesalers at that time to be excessive or unreasonable. DACO contends that the September 1985 memo sent by Secretary López–Feliciano provided notice to the wholesalers that DACO was not content with the margins which were being earned at that time, and that regulation was a distinct possibility. However, the evidence reveals that the warning lacked teeth, as DACO had established no regulation which could have forced the wholesalers to actually abide by the 8.6–cent profit margin. It seems more likely that the memo was wielded as a threat in order to remind the wholesalers of the power of DACO to regulate. As we held in 1986: "[t]he industry played the game with DACO by not going overboard on price setting, bearing in mind the historical federal margins and DACO's announced power to regulate." *Isla Petroleum Corp.,* 640 F.Supp. at 483. Although DACO investigated the wholesalers at the behest of the Retailers Association in early 1986, the agency did not regulate at that time; in fact, DACO took no concrete action regarding the wholesalers' margins until after the plummet in oil prices.

#### 2. *The Petroleum Excise Tax and the 1986 Order*

We do not find that the actions of DACO during 1986 evidenced an intent to implement a long-term regulatory plan in response to the margins of 1981–1985, but rather a short-term erratic response to the unprecedented levels of profits in early 1985, the resulting implementation of the new excise tax, and the wholesalers constitutional challenge to the April price freeze.

The April 23 order, temporary by its own terms, was promulgated in order to enforce the excise tax. There was credible testimony at trial that when the wholesalers began to complain to DACO about the fact that they were being forced to sell gas at below operating cost, Secretary Ortiz responded that the

---

**8.** DACO argues that laches cannot be a defense against the government when an action is brought to enforce a public right or protect the public interest. In *Block v. North Dakota,* 461 U.S. 273, 294, 103 S.Ct. 1811, 1824, 75 L.Ed.2d 840 (1983) (O'Connor, J., dissenting), the Court reaffirmed this principle, explaining that the "public interest in preserving public rights and property from injury and loss attributable to the negligence of public officers and agents, through whom the public must act, justified a special rule for the sovereign." While we cannot apply the doctrine of laches as a complete bar against an action by the sovereign, we do find that considerations of delay can play a part in the determination of whether equity demands restitution.

control was temporary, and that as soon as the new tax was absorbed, and the political situation alleviated, there would be a return to a free market. Of course, Ortiz also explained that he was not the final arbiter of DACO's actions, but we find his opinion on the matter to have been at least indicative of DACO's intentions. If there was an intent to carry out the ongoing regulation of the wholesalers, we find it improbable that the Secretary would have conveyed the exact opposite message to the companies' representatives. At the least, this evidence of a possible internal conflict suggests a lack of a coherent policy of regulation at the time.

Nor did the issuance of the May 20 order reveal a long-term regulatory strategy. Rather, it was yet another temporary measure, promulgated on the eve of trial, without a proper economic basis, in an attempt to avoid the injunction requested by the wholesalers. The regulation, termed a "Temporary Order," stated that one of DACO's long-term objectives was to "achieve, as soon as possible, a situation wherein the competitive forces are the ones mainly relied upon for the regulation of gasoline [sic] the gasoline markets in Puerto Rico." *See Second Temporary Resolution and Order on Prices and Gross Profit Margins on Gasoline* (May 20, 1986). The order was issued without hearings, immediately before the trial challenging the April 23 order was scheduled to begin. The text of the order admitted the lack of, and need for, findings by DACO on whether the operating costs of the wholesalers had increased since the 8.6–cent margin was last enforced at the federal level, five years earlier. The manner of implementing the May 20 order reflects a quick fix to a political problem, not an informed regulatory process indicative of long term agency planning.

### 3. Actions of DACO During the Injunction

DACO suggests that several statements made during the period of the injunction provide evidence of DACO's intent to regulate. First, DACO requested a stay of the injunction both before this court and before the First Circuit. However, the affidavits of Ortiz in support of the stays reveal no long-term regulatory intent. DACO may have sought the stay for the same reasons that regulation was implemented at that time: As a temporary solution to a unique situation. In addition, the breadth of the injunction— which prohibited not only enforcement of the 8.6 cent order, but held that any regulation at all was preempted by federal law—meant that even to continue the prior DACO practice of controlling prices by holding the threat of regulation over the wholesalers' heads necessitated a stay of the injunction.

Next, DACO cites several quotes attributed to Ortiz during 1987, in which he opined that competition between the wholesalers was weak or nonexistent, and expressed DACO's desire to regulate profit margins. Interestingly, in the first article cited by DACO, a press release from September of 1986, Ortiz bases his proclamation of a lack of competition among the wholesalers in part on the fact that while crude oil prices fell 50% during late 1985 and early 1986, and the price from refineries to wholesalers dropped about 41%, the selling price of the wholesalers dropped by only 15%. However, we know from the testimony at trial that during this same period, representatives of the Puerto Rico government were threatening wholesalers with serious repercussions if they passed on the drop in acquisition costs to the retailers. We hardly think that a finding of a lack of competitiveness should be premised upon an action which was coerced by the government.

Each of the press statements made by Ortiz in this period must also be placed in context. DACO was appealing the injunction and attempting to establish that the right to regulate gasoline prices at the state level was not completely preempted by a federal policy of deregulation. We do not find it surprising that the Secretary of DACO would want to be on the record stating that if the regulatory power were restored, DACO would make use of it.

### 4. Actions of DACO Following the Supreme Court Decision

The actions of DACO between the time that the Supreme Court restored the power to regulate and when the First Circuit vacated the injunction provide insight into the regulatory intent of DACO. As all parties

agree, the Supreme Court decision opened the door for DACO to regulate the wholesalers. However, no regulation was actually implemented until after the First Circuit vacated the injunction, over a year after the Supreme Court decision. DACO argues that although it had the power to regulate in 1988, the agency took a more conservative path by collecting information from the wholesalers, which was unavailable during the injunction, holding hearings, and waiting on the decision of the First Circuit, in order to better gauge what level of regulation would withstand a constitutional challenge. While we understand that DACO could have been reticent about facing the possibility of another court battle (which of course ultimately happened when the 13-cent regulation was passed), and we agree that waiting for guidance from the circuit may have been a prudent course of action, the evidence received at trial leads us to conclude that such reasoning did not actually occur in 1988, but is being suggested in 1994 to explain the fact that DACO decided not to regulate six years earlier.

Ortiz admitted at trial that he told the wholesalers in private meetings soon after the Supreme Court decision that his "personal preference was to see the market depending on its own forces and that some day will come that the government will have no need to establish a regulation" but that "the policy of the government, especially the policy of Governor Hernández Colón, was to maintain controls." *Transcript of Proceedings*, Vol. 2 at 62–63. However, the testimony of the wholesaler representatives regarding their beliefs at the time, and contemporaneous memorandums written by those representatives to their superiors, while reflecting a wariness of the possibility of regulation, conveyed no general understanding that Ortiz lacked any control over the future of regulations. Rather, the evidence shows that the wholesalers came away with a sense that Ortiz strongly believed in the free market, was under political pressure to regulate, and was looking for support for his position.

At trial, Ortiz gave an explanation of the December 1988 news articles which stated that DACO had made a decision not to regulate the gasoline market, but rather to utilize

close supervision and implement quarterly reporting. Ortiz suggested that the article may have reflected a decision not to implement a direct price control, but that no decision had been made in reference to controls on gross profit margin. We find that this claim lacks credence. The idea of a price freeze had been basically dismissed shortly following the Supreme Court decision in May 1988. Ortiz' public statements rejected the idea of a freeze, and the public hearings held at that time focused on profit margin regulation.

DACO points out that a press interview would be a rather strange way to announce a major regulatory decision, that no official statement regarding a decision not to regulate margins was ever propagated, and that none of the wholesalers bothered to confirm with DACO this alleged decision not to regulate. However, while we cannot say exactly what typical administrative procedure should be utilized to announce the decision of an agency not to regulate, we note that DACO did have in effect a regular policy of utilizing the press for communications from the Secretary regarding agency decisions. In addition, a formal amendment to Price Regulation No. 45 was promulgated on December 28, 1988, which had the overall effect of loosening the amount of control over the wholesalers by rescinding the fifteen day notice condition, implementing new quarterly reporting requirements, and containing no price margin regulation. The implementation of the periodic reporting requirements also would be consistent with a plan by DACO to utilize monitoring of profit margins in lieu of actual profit regulation.

Whether or not Ortiz conveyed powerlessness in his desire to avoid regulation of margins, and regardless of exactly what he reported to *El Nuevo Día* in December 1988, the fact remains that no regulation was promulgated during the period between the Supreme Court and the First Circuit rulings. Following the in-depth study, the hearings, and the private meetings with the wholesalers, DACO ultimately did not regulate.

DACO claims that the agency had not completed an internal study on whether to regulate by the time that Ortiz left office in

early January of 1989, and, in fact, did not complete the process of regulation until November 30, 1989, when the 13–cent regulation was issued. However, we find it telling that the Interim Order eventually implemented in June of 1989, following the First Circuit decision, states on its face that it is based on an investigation of the gasoline industry conducted in May of 1989. In fact, according to a press release issued by DACO in May, that same investigation was precipitated by the "erratic and unstable aspects of gasoline prices in Puerto Rico, starting from the oil spill in Alaska when the 'Exxon Valdez' ran aground." We find DACO's current portrayal of a coherent progression after the Supreme Court decision, involving investigation, anticipation of guidance from the First Circuit, and culmination in the 13–cent permanent order, to contain some elements of revisionist history. We think that it is more rational to conclude that, as of December 1988, DACO had completed its study of the market, begun in May of that year, and determined that margin controls were unnecessary at that juncture.

DACO ascribes importance to the fact that the May 20 order remained on the books during the entire injunction period, suggesting that this fact is indicative of the agency's intent to regulate. Of course, the repeal of the May 20 regulation would have rendered the suit in the First Circuit moot, leaving DACO with no choice but to keep the regulation on the books if the agency desired to continue the appeal. The continuation of the appeal itself may be indicative of DACO's intent to regulate, but in the context of the contemporaneous statements being made by DACO to the press and at private meetings, and the lack of actual regulation during 1988, we find the retention of the May 20 order to lack significance.

### 5. DACO's Actions After the First Circuit Decision

DACO argues that the evidence most indicative of what the agency would have done if no injunction had ever been issued is what happened after the injunction was vacated in June 1989, at which point the interim 11–cent per gallon profit margin regulation was implemented.

However, there is evidence that political, and not primarily economic, considerations shaped the decision to regulate following the First Circuit ruling. In January of 1989, a resolution was introduced in the Puerto Rico House of Representatives requesting an explanation from DACO as to why the agency was not regulating prices. As mentioned above, the aftermath of the Exxon Valdez oil spill was wreaking havoc on retail gasoline prices that Spring. In addition, there seems to have been some sensitivity of the government to the possibility that a lack of regulation following the victories at the Supreme and Circuit courts would be poorly received by the public. As DACO's counsel put it, a failure to regulate "could be made to appear that DACO is admitting defeat and conceding that it cannot control the oil companies.... DACO could even be seen as siding with the oil companies against the Puerto Rican consumer." Memorandum of Attorney Lynn Coleman to Governor Rafael Hernández Colón, Plaintiff's Exhibit 78 at 9.[9]

In sum, we think that this situation lacks the straightforward allure of cases where an agency regulation is enjoined, ultimately upheld, and then enforced. Although, of course, we will never know what may have occurred during the interval when DACO's hand was stayed, placing the events in a historic context, based on the evidence pre-

---

9. The memorandum which included this statement was one of several documents generated by DACO's outside counsel which were inadvertently revealed to Texaco's counsel by DACO. After DACO objected, we ruled that the documents were not protected by the attorney-client privilege or the work-product rule. This ruling was based in part on our finding that these documents reveal that DACO had, in essence, delegated its administrative functions to outside counsel by relying heavily on such counsel to draft orders and develop the underlying data. As a result, we

found that the controverted documents generated by counsel had essentially become part of the adjudicative record. *See Docket Document No. 223* (Order of November 12, 1992). *See also Alldread v. Grenada,* 988 F.2d 1425, 1434 (5th Cir.1993) (inadvertent disclosure of material subject to attorney-client privilege may constitute waiver); *Carter v. Gibbs,* 909 F.2d 1450, 1451 (Fed.Cir.1990) (inadvertent disclosure of attorney work product undermines the policy behind protecting such information and, therefore, waives the work-product protection).

sented at trial, we cannot agree with DACO that what occurred was a typical regulatory process, interrupted by the action of the court. In sum, we find that DACO has failed to carry its burden of proof on the question of whether controls would have been implemented during the relevant period.

## B. *Equitable Considerations*

Even if we were to find that DACO would have regulated during the injunction period, we cannot conclude that the balance of equities requires a disgorgement of profits earned six to eight years ago.

### 1. *Benefit to Wholesalers During Injunction*

DACO presented the expert testimony of Dr. Robert Logan, an economist and employee of DACO's outside counsel, Skadden, Arps, Slate, Meagher & Flom from 1989 to 1991. Dr. Logan played a substantial role in drafting the Final Regulation issued in November 1989, and submitted affidavits to this court in support of that order during the 1990 litigation. In addition, Dr. Logan aided DACO in creating a Report on Refunds, in order to determine the amount of restitution requested, and submitted a declaration to this court in support of the conclusions in that Report.

In addition to testifying about how the amount of restitution requested was calculated for the three wholesalers individually, Dr. Logan testified as to his opinions regarding the competitiveness of the wholesale market and the implications of that opinion on whether the wholesale prices during the injunction were unreasonable, concluding that the wholesalers were not competitive during the injunction period, and were able to earn a return in excess of what was necessary to attract capital. We must view Dr. Logan's testimony with some skepticism in light of his intimate involvement with DACO, as a Skadden, Arps employee and as the putative author of the 13–cent regulation. *See Kohl v. Woodhaven Learning Center*, 865 F.2d 930, 944 (8th Cir.), *cert. denied*, 493 U.S. 892, 110 S.Ct. 239, 107 L.Ed.2d 189 (1989) (it is within discretion of district court to believe one expert witness over another when there is support in the record for that decision).

The wholesalers presented many economic experts. Esso presented the testimony of economist Dr. Joseph P. Kalt, the Academic Dean for Research at the John F. Kennedy School of Government, Harvard University. Shell utilized the services of two consultants, economists Dr. William B. Tye and Dr. Jorge Freyre Serra, and economic consultant Dr. Michelle Burtis testified for Texaco. Not surprisingly, the wholesalers' experts testified that the market was competitive, and that profits earned during the injunction were reasonable. The economists presented credible evidence that the profits earned during the period of the injunction were in line with profits earned during the unregulated period after federal controls were terminated, and before the 1986 regulation was enacted. The experts also analyzed the profits earned compared with other investment possibilities during the same time frame. Among other analyses, the performance of the wholesalers during the disputed period was compared to average rates of return on stocks in the Standard and Poors 500 Portfolio of stocks, returns on electric utility stocks, returns on government bonds, and to average accounting returns in the industrial distribution, services and fuel industries. These comparisons established that the returns earned by the wholesalers during the injunction were in line with various competitive industries and investment alternatives.

Testimony was also presented regarding evidence indicative of the competitiveness of the market for wholesalers in Puerto Rico. The experts testified that there was evidence that the wholesalers were competing over a variety of dimensions, that the smaller independent firms had been able to gain former customers of the large plaintiff wholesalers, and that there were no significant barriers to entry in the market other than those associated with a highly saturated market.

The experts also offered evidence of the robustness of the Puerto Rican economy during the years of the injunction. The testimony established that between 1985 and 1989, the island's economy was growing at a rate higher than at any other point from 1981 to the present, and at a higher rate than the

economy of the continental United States during the same period, suggesting that high profits were to be expected during such a period.

The wholesalers' experts provided testimony regarding some of the conclusions utilized by Dr. Logan in calculating the amount of requested refunds. In particular, the experts testified regarding DACO's method of calculating the wholesalers' capital bases, which were utilized to determine possible refund amounts based upon the wholesalers' rates of return.[10] According to credible evidence by these experts, Dr. Logan's methodology for calculating the capital base of each company is inconsistent with principles utilized by independent accounting firms and the Puerto Rico Treasury Department.

Without diverting into a treatise on competitiveness of the gasoline wholesale industry, the success of various alternative investments, or general accounting principles, and for the limited purpose of considering whether the economic strength of the wholesalers due to their control over the market allowed them to take advantage of the years of freedom from regulation during the injunction, we must conclude that the wholesalers did not benefit disproportionately from the lack of regulation.

### 2. Delay

DACO's actions in seeking restitution have been marked by unreasonable delay. The issue was first brought up in the 11-cent-per-gallon Interim Order, promulgated in June 1989. In the final 13-cent order issued in November 1989, refunds were mentioned again. The letters regarding DACO's preliminary views on the issue of refunds were sent in April of 1990. The issue was then dropped by DACO until the August 20, 1992 press conference announcing the plan to obtain refunds from the three wholesalers. This type of stopping and starting, delaying and then proceeding must be considered prejudicial to the wholesalers, who had to run their business with the threat of multi-million dollar refunds occasionally flaring up and then disappearing. While we under-stand that DACO has a small staff and a broad mandate, and that there were a number of turnovers in the office of the Secretary of DACO during the period in question, and we realize that time and resources were spent in litigating the Interim and Final Regulations, we cannot countenance this lack of coherent policy by the agency.

### 3. Bad Faith

Evidence of bad faith on the part of DACO permeates the record of this controversy. The veiled threats made against the wholesalers by top government officials during the meetings in 1986 were certainly not paragons of good faith administrative procedure. The May 20, 1986 order, issued without appropriate hearings, on the eve of a trial scheduled to evaluate the April 23 order, was clearly a litigation tactic, meant to forestall action by this court against DACO's rulemaking. The actions of Secretary Mojica, who failed to review the administrative record, and held a press conference without any prior notice to the wholesalers, in order to announce DACO's intent to claim $247.2 million in refunds from Texaco, Esso, and Shell, were not what would be expected from the head of an administrative agency. Mojica admitted at trial that the first Remedial Order utilized the 8.6-cent margin in order to start with the highest amount of refunds possible and then force the wholesalers to come to DACO with evidence that the 8.6-cent level was not justified. The method of announcing the refunds, and the use of the insupportable 8.6-cent profit margin figure, against the advice of DACO staff, were irresponsible. There is also a taint of bad faith to the fact that while some wholesalers other than Texaco, Esso, and Shell had also earned profits above the 8.6-cent level during the injunction, DACO restricted the 1992 remedial request to these three companies. We find that throughout this litigation, DACO has behaved in a questionable manner which dictates against equitable relief.

### 4. Reliance

Reliance factors may also play a role in our consideration of whether a refund would be

---

10. In order to utilize either the average return on utilities plus one percent, or a ten percent return on assets, two of the possible refund measures advanced by DACO, the agency would need to calculate the wholesalers' rates of return during the injunction period.

equitable. While the wholesalers sought the injunction of their own accord, and cannot claim reliance on the granting of their request, they could rely on various actions by the agency.

The failure of DACO to seek a bond or set up an escrow account for profits greater than the enjoined regulation may have lulled the wholesalers into a belief that refunds would not be demanded. Many of the cases in which the remedy of restitution has been granted following the injunction of an agency action have involved a bond or fund which was set aside to contain the difference between the enjoined rate or price and the actual rate or price. *See, e.g., Arkadelphia*, 249 U.S. at 134, 39 S.Ct. at 237; *Morgan*, 307 U.S. at 183, 59 S.Ct. at .795; *Middlewest Motor Freight Bureau v. United States*, 433 F.2d 212 (8th Cir.1970), *cert. denied*, 402 U.S. 999, 91 S.Ct. 2169, 29 L.Ed.2d 165 (1971); *Abbotts Dairies v. Butz*, 584 F.2d 12 (3d Cir.1978). Conversely, in *Moss*, the court found that the fact "that there is no fund of net enrichment from which restitution could appropriately be made" was one factor weighing in the equitable balance against restitution. *Moss*, 521 F.2d at 314. We find the same factor to be significant here.

DACO imputes significance to a statement made by this court in denying a stay of the injunction, that "this is not a case where 'the status quo could never be restored,'" *Isla Petroleum Corp.*, 640 F.Supp. at 518, suggesting that it should have put the wholesalers on notice of the possibility of restitution. That statement was part of the analysis of typical criteria utilized in determining whether a stay of an injunction is proper. By no stretch of the imagination did it occur to this court that we would later be confronted with a refund petition under the circumstances described above. In any event, we assign greater importance to the acts of DACO in failing to provide for the possibility of refunds than in statements of the court taken out of context.

Public and private statements made by the Secretary during the injunction, and particularly following the Supreme Court decision, could have reasonably led the wholesalers to believe that the margins earned were considered by DACO to be reasonable, and therefore, that restitution of such reasonable profits would not later be demanded, and to rely on such statements in formulating business plans.

The evidence shows that such reliance by the wholesalers did indeed occur. The testimony at trial established that the wholesalers decided to continue to make investments in Puerto Rico that would not have occurred if the companies were aware of DACO's plan to seek refunds. There was evidence that if the wholesalers had been cognizant of such a plan they would have utilized their investment dollars in more attractive markets.

### 5. *Public Interest*

The wholesalers presented detailed testimony regarding the effect upon the companies if they were forced to disgorge previous profits. If restitution were granted, it is likely that investment in Puerto Rico by the gasoline companies would be curtailed, or that Esso, Texaco and/or Shell could even leave the island completely, resulting in a possible loss of jobs and competitiveness in the wholesaling market. In this vein, we take note of the findings of the D.C. Circuit: "The bite which is effectively taken from future earnings by a recovery fund may in turn impair the health of the industry, to the disadvantage of the fare-payers themselves." *Moss*, 521 F.2d at 308.

The imperfect status of restitution also weighs in the balance against requiring refunds. Even assuming that the unchecked profits that the wholesalers earned during the injunction were the result of inflated prices at the pump, we cannot restore the excess paid to the actual consumers who suffered. Such a result would not be achieved by depositing refund payments into the Puerto Rico Treasury General Fund. DACO has failed to propose a cogent plan to restore losses to the Puerto Rico motorists. We believe that the agency had an obligation to do so as part of their trial preparation. The proposed deposit into the General Fund will mean that the money will evaporate into unrelated items of government expenditure. The General Fund seems to possess that magic. *Cf. Alcoa v. Pérez*, 424 F.2d 433 (1st Cir.1970).

## IV.

### *Conclusion*

On the basis of the above, DACO's petition for refunds against Texaco, Esso, and Shell is DENIED. Judgment shall be entered accordingly.

**IT IS SO ORDERED.**