USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT _________________________ No. 94-2076 TEXACO PUERTO RICO, INC., ET AL., Plaintiffs, Appellees, v. DEPARTMENT OF CONSUMER AFFAIRS, ET AL., Defendants, Appellants. __________________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO [Hon. Jose Antonio Fuste, U.S. District Judge] ___________________ __________________________ Before Selya, Circuit Judge, _____________ Coffin, Senior Circuit Judge, ____________________ and Cyr, Circuit Judge. _____________ __________________________  Lynn R. Coleman, with whom Pedro R. Pierluisi, Secretary of ________________ __________________ Justice, Roberto Ruiz Comas, Director, Federal Litigation _____________________ Division, Dep't of Justice, Richard L. Brusca, Matthew W.S. ___________________ _____________ Estes, Laura A. Ingraham, and Skadden, Arps, Slate, Meagher & _____ _________________ _________________________________ Flom were on brief, for appellants. ____ Alan M. Grimaldi, with whom Jerrold J. Ganzfried, Patricia _________________ _____________________ ________ G. Butler, Howrey & Simon, William Estrella, and Ricks P. Frazier _________ ______________ ________________ ________________ were on brief, for appellee Texaco Puerto Rico, Inc. Donald B. Craven, with whom James P. Tuite, Anthony F. _________________ ________________ ___________ Shelley, James R. Lovelace, Alvaro I. Anillo, Miller & Chevalier, _______ _________________ ________________ ___________________ Chtd, Luis Sanchez Betances, Jaime Sifre Rodriguez, Miguel P. ____ ______________________ ______________________ _________ Cancio Bigas, and Sanchez Betances & Sifre were on brief, for ____________ _________________________ appellee Esso Standard Oil Co. (P.R.). Ana Matilde Nin, with whom Rafael Perez-Bachs, Gilberto J. ________________ ___________________ ___________ Marxuach-Torros, and McConnell Valdes were on brief, for appellee _______________ ________________ Shell Co. (P.R.) Ltd. _________________________ July 19, 1995 _________________________ SELYA, Circuit Judge. In 1986, the Puerto Rico SELYA, Circuit Judge. ______________ Department of Consumer Affairs (DACO) took a small, tentative step toward regulating the profit margins of gasoline wholesalers. The wholesalers treated this move as a declaration of war. They mounted a courtroom counteroffensive and succeeded in obtaining an injunction against the enforcement of DACO's embryonic regulation. Following a series of pitched battles that stretched from San Juan to Boston to the banks of the Potomac and back again, DACO emerged victorious. Long after the injunction had been vacated, DACO purposed to exact tribute from the vanquished. Specifically, it sought restitution from the wholesalers based on the "excess" profits that they allegedly earned while shielded by the injunction. The district court declined to grant the envisioned spoils. We affirm. I. BACKGROUND I. BACKGROUND This is presumably the final skirmish in a decade-long conflict. Other jousts are chronicled in a series of published opinions. See, e.g., Puerto Rico Dep't of Consumer Affairs v. ___ ____ _______________________________________ Isla Petroleum Corp., 485 U.S. 495 (1988) (Isla III); Tenoco Oil _____________________ ________ __________ Co. v. Department of Consumer Affairs, 876 F.2d 1013 (1st Cir. ___ _______________________________ 1989); Isla Petroleum Corp. v. Puerto Rico Dep't of Consumer _____________________ _______________________________ Affairs, 811 F.2d 1511 (Temp. Emer. Ct. App. 1986) (Isla II); _______ ________ Texaco Puerto Rico, Inc. v. Mojica Maldonado, 862 F. Supp. 692 _________________________ ________________ (D.P.R. 1994) (TPR II); Texaco Puerto Rico, Inc. v. Ocasio _______ ___________________________ ______ Rodriguez, 749 F. Supp. 348 (D.P.R. 1990) (TPR I); Isla Petroleum _________ _____ ______________ 2 Corp. v. Department of Consumer Affairs, 640 F. Supp. 474 (D.P.R. _____ ______________________________ 1986) (Isla I). Given the detail contained in these earlier ______ opinions, we believe that a condensed summary of the hostilities will suffice for the nonce. From 1973 forward, the federal government imposed price controls on the sale of petroleum and petroleum products. See 15 ___ U.S.C. 751-760h (as amended). At the time federal controls ended in early 1981, the regulatory scheme limited wholesalers' gross profit margins (GPMs) on the sale of gasoline to 8.6 cents per gallon.1 See Tenoco, 876 F.2d at 1015 (recounting history ___ ______ of federal regulatory policy). Although bureaucrats are reputed to abhor a vacuum, DACO an arm of Puerto Rico's government empowered by local law to regulate prices and profit margins in order to protect consumers, see P.R. Laws Ann. tit. 3, 341b ___ (1982) did not immediately impose its own controls. By 1985, the GPMs of gasoline wholesalers in Puerto Rico ranged from 6.9 to 16.76 per gallon. In early 1986, world oil prices plummeted but the price of gasoline in Puerto Rico (both wholesale and retail) failed to follow suit. The Puerto Rico legislature, ostensibly concerned that the oil companies were taking unfair advantage, imposed an excise tax on crude oil and refined petroleum products. In connection with the new tax, DACO promulgated an administrative order under date of April 23,  ____________________ 1A GPM represents the difference between the sales price and the seller's acquisition cost. The latter cost includes the price of the gasoline plus excise taxes, but excludes operating costs. See Tenoco, 876 F.2d at 1015. ___ ______ 3 1986. The order prohibited wholesalers from passing the tax through to retailers. It also froze wholesale and retail gasoline prices at their March 31, 1986 levels. When, thereafter, world oil prices soared, the price freeze forced several wholesalers to sell gasoline at prices below their acquisition costs. Since large oil companies are not in business to lose money, a coterie of wholesalers (including the trio that appear as appellees here) wasted little time in asking the federal district court to enjoin enforcement of the April 23 order. Moving with equal celerity, the district court scheduled a trial on the merits for May 21, 1986. See Fed. R. ___ Civ. P. 65(a)(2) (authorizing the district court to "order the trial on the merits to be advanced and consolidated with the hearing on the application [for preliminary injunction]"). On May 20, DACO reshuffled the cards; it rescinded the price freeze and issued what it called a "temporary" order that harked back to the former, federally inspired ceiling and established, in lieu of the thawed freeze, maximum GPMs of 8.6 per gallon for petroleum wholesalers. The May 20 order also scheduled a public hearing for June 2 to "receive comments from all interested persons on the adequacy of this Temporary Order and on any modifications that should be made to attain a situation where primary reliance can be placed on competitive market forces to maintain fair margins at all levels of distribution and fair prices for the consumer." This maneuver did not derail the litigation. The 4 district court merely switched tracks, trained its sights on the May 20 edict, and went forward with a three-day bench trial. On June 4 roughly ten days after the trial ended the court enjoined enforcement of the May 20 order on federal preemption and other constitutional grounds. See Isla I, 640 F. Supp. at ___ ______ 515. DACO appealed the preemption ruling to the Temporary Emergency Court of Appeals (TECA), see 15 U.S.C. 754(a)(1) ___ (granting TECA exclusive jurisdiction over claims arising directly under the Emergency Petroleum Allocation Act of 1973), and appealed the remaining rulings (e.g., the invalidation of the ____ order on due process and takings grounds) to this court. We stayed proceedings pending consideration of the preemption ruling. TECA affirmed that ruling, see Isla II, 811 F.2d at ___ ________ 1519, but the Justices reversed, holding that federal law did not forbid state regulation of gasoline prices. See Isla III, 485 ___ ________ U.S. at 499-501. This court then took up DACO's concurrent appeal and vacated the district court's injunction as premature. See Tenoco, 876 F.2d at 1024. ___ ______ On June 27, 1989 (the day after we issued our mandate incinerating the district court's injunction), DACO promulgated an interim order establishing a maximum GPM of 11 per gallon, effective forthwith. Its final order, issued on November 30, 1989, adopted a ceiling of 13 per gallon. That order withstood a vigorous constitutional challenge by the wholesalers. See TPR ___ ___ I, 749 F. Supp. 348. _ 5 An ensuing period of unaccustomed tranquility ended abruptly in mid-1992 when DACO again took up the cudgels. It issued a so-called remedial order in which it sought to recoup almost $250,000,000 in profits exceeding an 8.6 per gallon GPM that it estimated three wholesalers Texaco Puerto Rico, Inc., Esso Standard Oil Co. (P.R.), and the Shell Company (Puerto Rico) Ltd. (appellees here) had earned during the three-year life (June 1986 to June 1989) of the errant injunction.2 The wholesalers quickly repaired to the district court and requested protection from the remedial order. Before the court could act, DACO issued a revised remedial order. Under its terms, a wholesaler could choose between paying a refund based on a retrospective GPM of 13 per gallon for the injunction period or paying one based on whatever profit margin would have allowed it to achieve an annual return on assets equal to the average return on assets for the electric utility industry, plus one percent, during the same period. The wholesalers were not mollified. They challenged the revised remedial order and, on April 1, 1993, DACO rescinded it. This hasty retreat did not restore the peace, for the agency simply attacked on a different front. It revivified the court action originally instituted by the oil companies and filed a motion for restitution seeking an award equal to the excess profits that the wholesalers would have been forced to disgorge  ____________________ 2We refer to the three oil companies collectively as "the wholesalers," and individually as "Texaco," "Esso," and "Shell." 6 but for the pendency of the improvidently issued injunction. Following a tumultuous period of discovery, see, e.g., infra Part ___ ____ _____ III (discussing certain disputed discovery rulings), and a three- week bench trial, the court denied the motion for restitution on September 9, 1994. SeeTPR II, 862F. Supp.at 709. DACO nowappeals. _________ II. THE MERITS II. THE MERITS Our analysis of the merits is partitioned into four segments. We discuss the nature of restitution, parse the decision below, limn the standard of review, and, finally, examine the record to determine whether the denial of restitution can be upheld. A. The Nature of Restitution. A. The Nature of Restitution. _________________________ In its motion, DACO sought restitution based upon the hoary adage "that a party against whom an erroneous judgment or decree has been carried into effect is entitled, in the event of a reversal, to be restored by his adversary to that which he has lost thereby." Arkadelphia Milling Co. v. St. Louis S.W. Ry. ________________________ ____________________ Co., 249 U.S. 134, 145 (1919). We agree with this tenet, but ___ caution that it tells only half the tale. Restitution is not a matter of right, but a matter of sound equitable discretion. See ___ Atlantic Coast Line R.R. Co. v. Florida, 295 U.S. 301, 310 _______________________________ _______ (1935); Democratic Central Comm. v. Washington Metro. Area __________________________ ________________________ Transit Comm'n, 485 F.2d 786, 825 (D.C. Cir. 1973); Restatement ______________ of Restitution 142, cmt. a, at 568 (1937). Because restitution is a creature of equity, a claimant can prevail only by showing that it will offend "equity and good conscience" if the other 7 party is permitted to retain the disputed funds. Atlantic Coast ______________ Line, 295 U.S. at 309. Put another way, restitution is a remedy ____ ex gratia that a court will withhold when "the justice of the __ ______ case does not call for it . . . ." Id. at 310; accord Williams ___ ______ ________ v. Washington Metro. Area Transit Comm'n, 415 F.2d 922, 941-47 ______________________________________ (D.C. Cir. 1968), cert. denied, 393 U.S. 1081 (1969). _____ ______ This emphasis on the particulars of each individual case is consistent with the central feature of equity jurisdiction: "the ability to assess all relevant facts and circumstances and tailor appropriate relief on a case by case basis." Rosario-Torres v. Hernandez-Colon, 889 F.2d 314, 321 ______________ _______________ (1st Cir. 1989) (en banc); see also Hecht Co. v. Bowles, 321 U.S. ___ ____ _________ ______ 321, 329 (1944) ("The essence of equity jurisdiction has been the power . . . to mould each decree to the necessities of the particular case."); Lussier v. Runyon, 50 F.3d 1103, 1110 (1st _______ ______ Cir. 1995) (stating that "the hallmarks of equity have long been flexibility and particularity"), petition for cert. filed (U.S. ________ ___ _____ _____ June 5, 1995) (No. 94-1979). Claims for restitution arising out of the vacation or reversal of a judgment are tested by the same standards as other claims for restitution. See Atlantic Coast Line, 295 U.S.at 310; ___ ___________________ see also Restatement, supra, 74, at 302-03 ("A person who has ___ ____ _____ conferred a benefit upon another in compliance with a judgment, or whose property has been taken thereunder, is entitled to restitution if the judgment is reversed or set aside, unless restitution would be inequitable . . . ."). This approach 8 obtains in respect to both public and private actions, and, thus, applies when, as now, a restitutionary claim arises out of an errant injunction barring enforcement of a governmental regulation. See, e.g., Arkadelphia, 249 U.S. at 145 (ordering ___ ____ ___________ restitution by a regulated company that charged more during an injunction period than the rate ultimately deemed lawful); Williams, 415 F.2d at 941-47 (similar); see also United States v. ________ ___ ____ _____________ Morgan, 307 U.S. 183, 197-98 (1939). ______ B. The Decision Below. B. The Decision Below. __________________ The district court predicated its denial of DACO's motion for restitution on alternative grounds. In the first place, the court determined that there was no benefit to be restored as the wholesalers had not profited from the injunction. See TPR II, 862 F. Supp. at 705-06. This determination rested ___ ______ upon a finding that DACO failed to show that it would have regulated wholesalers' GPMs during the relevant period but for the improvidently issued injunction. See id. at 702-06. In the ___ ___ second place, the court determined that, even assuming that the injunction conferred an economic benefit, "the balance of equities" did not require "a disgorgement of profits earned six to eight years ago." Id. at 706. ___ This latter determination rested upon an analysis of five equitable factors. First, based on evidence regarding the competitiveness of the gasoline market and earnings in other industries, the court found that the wholesalers "did not benefit disproportionately from the lack of regulation." Id. at 707. ___ 9 Next, the court found DACO guilty of "unreasonable delay" in seeking restitution. Id. Third, the court concluded that DACO ___ exhibited bad faith with regard to Texaco, Esso, and Shell. See ___ id. Fourth, the court determined that DACO's actions during the ___ injunction period had lulled the wholesalers into believing that DACO would not demand restitution. See id. at 708. Finally, the ___ ___ court thought that the public interest did not favor a restitutionary order. See id. ___ ___ C. Standard of Review. C. Standard of Review. __________________ Appellate review often calls into play a blend of rules. So it is here. We review the factual findings that undergird the trial court's ultimate determination only for clear error. See Lussier, 50 F.3d at 1111; Reilly v. United States, ___ _______ ______ ______________ 863 F.2d 149, 163 (1st Cir. 1988). In contrast, the trial court's articulation and application of legal principles is scrutinized de novo. See Cumpiano v. Banco Santander P.R., 902 __ ____ ___ ________ _____________________ F.2d 148, 152 (1st Cir. 1990). Thus, "to the extent that findings of fact can be shown to have been predicated upon, or induced by, errors of law, they will be accorded diminished respect on appeal." Dedham Water Co. v. Cumberland Farms Dairy, ________________ _______________________ Inc., 972 F.2d 453, 457 (1st Cir. 1992). ____ The main event evokes a different criterion. We review a district court's ultimate decision to grant or withhold an equitable remedy for abuse of discretion. See, e.g., Lussier, 50 ___ ____ _______ F.3d at 1111; Rosario-Torres, 889 F.2d at 323. Overall, the ______________ abuse-of-discretion standard is deferential, see, e.g., Dopp v. ___ ____ ____ 10 Pritzker, 38 F.3d 1239, 1253 (1st Cir. 1994), and "not appellant- ________ friendly," Lussier, 50 F.3d at 1111. The solicitude extended by _______ a reviewing court takes into account that the trial judge, "who has had first-hand exposure to the litigants and the evidence, is in a considerably better position to bring the scales into balance than an appellate tribunal." Rosario-Torres, 889 F.2d at ______________ 323. For this reason, the court of appeals ordinarily will not find an abuse of discretion unless perscrutation of the record provides strong evidence that the trial judge indulged a serious lapse in judgment. See id. ___ ___ We inspect the voluminous record with these precepts in mind to ascertain whether the denial of DACO's motion for restitution is sustainable. D. Discussion. D. Discussion. __________ The court below began with the question of benefit, and treated that question as a discrete inquiry. See TPR II, 862 F. ___ _______ Supp. at 700. But this approach tends to put the cart before the horse. A court mulling a restitutionary remedy must almost always perform an equitable assay. Rather than isolating the question of whether the targeted party received a benefit (and if so, the likely extent thereof), we think it is preferable in the first instance to incorporate that question into the assay proper, unless, of course, the state of the evidence is such that the court can conclude with minimal effort that no benefit has been received. If, however, the factual situation is more cloudy and speculative, it ordinarily will prove a more fruitful use of 11 judicial energies to fold the issue of benefit into the wider issue of equity. Thus, the probability or improbability of whether DACO would have regulated wholesalers' profits during the injunction period can initially be conceived as a relevant, though not dispositive, equitable factor. More precise findings as to the incidence and effect of any benefit can then be pinpointed as part of a calculation anent damages if restitution is ultimately found to be a condign remedy in a particular situation. With this preface, we turn to an examination of the judgment below. For ease in reference, we treat each group of factual findings as a separate integer in the equitable equation. The methodologic innovation that we have described introducing the question of whether the wholesalers benefitted from the injunction (and if so, to what extent) into the assay proper  does not require remand. The lower court made detailed factual findings on the question of benefit, and we can easily align those findings along the preferred legal matrix. See Societe des ___ ___________ Produits Nestle v. Casa Helvetia, Inc., 982 F.2d 633, 642 (1st ________________ ____________________ Cir. 1992); United States v. Mora, 821 F.2d 860, 869 (1st Cir. ______________ ____ 1987). 1. Benefit. Because restitution is founded on the 1. Benefit. _______ concept of unjust enrichment, a court considering a request for restitution must investigate the extent to which the target "received a benefit." Restatement, supra, 1, cmt. a, at 12. _____ In a case such as this, the problems of proof are readily 12 evident. The regulation that the district court enjoined was clearly labelled as temporary when promulgated, and the injunction prevented further regulation (temporary or permanent). Thus, DACO found itself, at trial, in an epistemological quandary: it had to prove that, had the district court sent the wholesalers packing, it (DACO) would have put into effect a more durable regulation that would have capped GPMs at a level below what the wholesalers actually earned during the pendency of the injunction. The district court found DACO's strivings inadequate to this daunting task. In the court's view, DACO's adoption of temporary margin controls in 1986 did not "evidence[] an intent to implement a long-term regulatory plan" to curb profit margins, but, instead, constituted "a short-term erratic response" to an unprecedented situation. TPR II, 862 F. Supp. at 702. The court ______ stressed that the unique combination of exigent circumstances to which DACO reacted soon dissipated, see id. at 702-03; that DACO ___ ___ thereafter made an in-depth study of the desirability of regulation, see id. at 704; and that, upon completion of the ___ ___ study, DACO decided not to regulate, see id. On this basis, the ___ ___ district court concluded that the stopgap measure would have been abandoned when the exigency abated; that DACO would not have implemented other GPM regulations during the June 1986 - June 1989 time frame; and that, therefore, the wholesalers received no monetary advantage from the injunction. See id. at 707. ___ ___ For the most part, this conclusion is adequately 13 anchored in the record. Later actions are often revelatory of earlier intentions, see, e.g., United States v. Sutton, 970 F.2d ___ ____ ______________ ______ 1001, 1007 (1st Cir. 1992) (holding that "challenged testimony, though it centered around later-occurring events, was relevant to show appellant's intent at an earlier date"); United States v. _____________ Mena, 933 F.2d 19, 25 n.5 (1st Cir. 1991) (similar); see also ____ ___ ____ Dedham Water, 972 F.2d at 460 n.4 (applying principle in _____________ affirming district court's findings in analogous circumstances), and DACO's actions when freed from the specter of preemption indicatequiteplainly thatlong-term regulationwasnot onthe agenda. The United States Supreme Court decided Isla III on _________ April 19, 1988. Within days, DACO disseminated a press release in which its Secretary, Pedro Ortiz Alvarez (Ortiz), crowed that the Court had "restored to Puerto Rico the historic power to regulate gasoline prices." Shortly thereafter, DACO commenced an administrative proceeding to determine whether controls should be introduced. To this end, it requested (and received) financial data and other information from the wholesalers. It also sought industry input as to whether the commonwealth should set either price or margin controls on gasoline, and held public hearings beginning in the fall of 1988 to consider the desirability of controls, the problems that might arise incident to them, and the reasonableness of existing profit margins in the industry. In December, as the administrative proceeding wound down, Esso's general manager, Charles Griffith, met with Secretary Ortiz. According to Griffith, Ortiz informed him that 14 DACO had completed its study and decided against imposing controls because "the market was behaving." Later that month, a daily newspaper, El Nuevo Dia, published an article based on an _____________ interview with Secretary Ortiz. The article reported that DACO had elected "not to regulate gasoline prices and to instead adopt `close supervision' of the industry." The newspaper quoted Secretary Ortiz as conceding that the wholesalers had not earned "excessive profits." In January of 1989, Ortiz resigned. The new Secretary, Jorge R. Ocasio Rodriguez (Ocasio), told Griffith that he was aware of the earlier study and of his predecessor's conclusions, and that he "intend[ed] to follow [Secretary Ortiz's] policies" in regard to petroleum wholesalers. In fact, DACO did not adopt controls until June 27, 1989 the day after the district court's injunction had been lifted and then attributed the about-face to newly emergent "erratic and unstable" price fluctuations in the Puerto Rico market. Noting this chronology of inaction laced with reassurances, and remarking bits of trial testimony such as Secretary Ortiz' oft-stated preference for a free market system, the district court concluded that DACO's failure to impose any controls for over a year after the Supreme Court's decision in Isla III cleared the regulatory path demonstrated that it lacked ________ long-term regulatory intent, and that in all likelihood it would not have regulated wholesalers' profits during the June 1986 - June 1989 time frame even if the injunction had never issued. 15 We believe the district court's finding that, during the injunction period, DACO would not have adopted a permanent regulation limiting profit margins to a level lower than those actually earned by the wholesalers is sustainable on this record. Still, DACO's assault on this determination possesses convictive force in one respect. The district court focused almost exclusively on DACO's actions from and after April of 1988 (when the Supreme Court overruled TECA and gave the green light to state regulation) in attempting to divine DACO's regulatory intent dating back to mid-1986. This strikes us as a sufficiently accurate barometer of long-term regulatory intent, _________ but fails to deal satisfactorily with the near term. The stopgap order that DACO promulgated on May 20, 1986 would have remained in effect for some period but for the injunction. Thus, even if ____ the district court's finding is accepted, some benefit however small still might have accrued to the wholesalers by reason of the district court's abrupt suspension of this order. That said, DACO's proof does not permit us to quantify that presumed benefit. Because DACO, as the claimant for restitution, bears the burden of proving the conferral and extent of a benefit, see Atlantic Coast Line, 295 U.S. at 309, this ___ ____________________ failure of proof looms large.3 We do not suggest that  ____________________ 3DACO's estimate of the benefit received it says that the wholesalers charged their customers anywhere from $64,500,000 to $250,000,000 more during the injunction period than DACO would have permitted is not only unproven but also deserves to be taken with a good deal of salt. DACO whips up the lower of these frothy figures by suggesting that, absent the injunction, it would have limited the wholesalers' GPMs to a level no higher 16 uncertainty as to the extent of the benefit acts as an automatic bar to DACO's claim for restitution, but for purposes of equitable balancing, it neutralizes any advantage that DACO might otherwise achieve on the question of benefit. In the last analysis, then, this factor is a wash.  2. The Wholesalers' GPMs. The district court analyzed 2. The Wholesalers' GPMs. _____________________ the wholesalers' profit margins during the pendency of the injunction and concluded that they "did not benefit disproportionately from the lack of regulation." TPR II, 862 F. ______ Supp. at 707. DACO disputes the relevancy of this factor. It argues that equity does not require there to be a disproportionate benefit, but, rather, that restitution is appropriate so long as the targeted party benefitted at all from __ ___ the erroneous injunction. In this view of the universe, the reasonableness of the wholesalers' earnings is beside the point. Once again, DACO's conception of equity is too inelastic. "The mere fact that a person benefits another is not of itself sufficient to require the other to make restitution therefor." Restatement, supra, 1, cmt. c, at 13. As the _____ district court noted, a finding that the wholesalers' actual profit margins were unreasonably high would assist in showing that "the money was received in such circumstances that the  ____________________ than 13 per gallon throughout the relevant period, and, therefore, that any earnings above that plateau are the fruits of the errant injunction. The higher figure is presumably derived in the same way, but using a projected regulatory ceiling of 8.6  per gallon (the ceiling imposed in the May 20, 1986 temporary order) for the entire three-year span. These gaudy claims enjoy little or no record support. 17 possessor will give offense to equity and good conscience if permitted to retain it." TPR II, 862 F. Supp. at 701 (quoting _______ Atlantic Coast Line, 295 U.S. at 309). The converse is equally ___________________ true: the fact that the wholesalers' profits were reasonable (or unreasonably low, for that matter), tends to make the denial of restitution more in keeping with equitable principles. Either way, the reasonableness vel non of the wholesalers' profits is a ___ ___ concinnous factor for inclusion in the court's equitable balancing. See Restatement, supra, 74, cmt. c, at 305 ___ _____ (suggesting that a party who receives a benefit is not liable to make restitution therefor unless the circumstances attendant to receipt or retention of the benefit render its enjoyment inequitable). The district court based its assessment that the wholesalers' earnings during the relevant period were reasonable on a series of subsidiary findings. It gave weight to the fact that the wholesalers' profits "were in line with profits earned during the unregulated period after federal controls were terminated, and before the 1986 regulation was enacted." TPR II, ______ 862 F. Supp. at 706. It then performed a comparative analysis4 and verified that the wholesalers' returns "were in line with various competitive industries and investment alternatives" during the injunction period. Id. Last but not least, the court ___  ____________________ 4The court used as congeners such benchmarks as returns on assets in the electric utility industry, returns on government bonds, and returns on investments in the industrial distribution, services, and fuel industries. See TPR II, 862 F. Supp. at 706. ___ ______ 18 observed that the wholesale market remained competitive throughout the period, thus ensuring that margins were held to acceptable levels. See id. ___ ___ DACO suggests that these findings have a tenuous basis in fact but this is a fairly typical rejoinder of a party seeking to surmount the high hurdle of clear-error review. The district court relied mainly on the testimony of four economists presented as expert witnesses by the wholesalers. We have studied their testimony (including the plethoric exhibits associated therewith), and we are fully persuaded that, given this evidence, the district court had a solid basis for finding that, during the injunction period, the wholesale market in Puerto Rico was staunchly competitive, and that the profits earned by Texaco, Esso, and Shell were reasonable. Although DACO's expert testified in a diametrically opposite vein, choosing between experts in a jury-waived trial is principally the business of the district court, not the court of appeals. See, e.g., Keller v. United States, 38 F.3d 16, 25 (1st Cir. ___ ____ ______ _____________ 1994). Consequently, we decline DACO's invitation to second- guess the trial court's scorecard in respect to dueling experts.5 See Anderson v. City of Bessemer City, 470 U.S. 564, ___ ________ ______________________  ____________________ 5The court below offered sound reasons for siding with the wholesalers' experts. Equally as important, it viewed the testimony of appellant's expert, Dr. Logan, "with some skepticism in light of his intimate involvement with DACO," his former employment by DACO's counsel, and his status as "the putative author of the 13-cent regulation." TPR II, 862 F. Supp. at 706. ______ Though DACO cries foul due to the court's "gratuitous swipe" at Dr. Logan's bona fides, such credibility determinations are the prerogative indeed, the duty of the district judge in a bench 19 575 (1985) (explaining the virtual impregnability of a trial judge's finding based on a reasoned decision to credit the testimony of one witness over another). 3. Delay. In weighing the equities, the lower court 3. Delay. _____ found that "DACO's actions in seeking restitution have been marked by unreasonable delay." TPR II, 862 F. Supp. at 707. ______ DACO asserts that the court's inclusion of this factor is improper as a matter of law because it is the functional equivalent of raising a laches defense against the government. We do not agree. It is true that laches ordinarily cannot be raised as a defense against the government in an action brought to enforce a public right or protect a public interest. See Illinois v. ___ ________ Kentucky, 500 U.S. 380, 388 (1991) (noting that "the laches ________ defense is generally inapplicable against a state"); Block v. _____ North Dakota ex rel Bd. of Univ. and Sch. Lands, 461 U.S. 273, _________________________________________________ 294 (1983) (O'Connor, J., dissenting) (collecting authorities). But the unavailability of laches as a defense does not mean that the sovereign's dilatoriness in seeking an equitable remedy must be totally disregarded by a chancery court. We explain briefly. An equitable defense and an equitable factor are conceptually and practically distinct. The divagation is subtle, but significant. An equitable defense "bar[s] the cause of  ____________________ trial. See, e.g., Anthony v. Sundlun, 952 F.2d 603, 606 (1st ___ ____ _______ _______ Cir. 1991) (stating that appellate courts "ought not to disturb supportable findings, based on witness credibility, made by a trial judge who has seen and heard the witnesses at first hand"). 20 action entirely, or bar[s] . . . the equitable remedy." 1 Dan B. Dobbs, Law of Remedies 2.4(1), at 91 (2d ed. 1993). Moreover, ________________ in evaluating an equitable defense, the court considers only the plaintiff's conduct and is free to "deny all remedies if the plaintiff does not meet equity's standards." Id. 2.4(5), at ___ 108-09. In contrast, an equitable factor must always be weighed in concert with other relevant factors. See id. at 109. ___ ___ Moreover, as part of balancing the equities, the court "looks at the conduct of both parties and the potential hardships that might result from a judicial decision either way." Id. From a ___ practical standpoint, then, "[e]ven when an equitable defense does not bar the claim, the total balance of equities and hardships might do so." Id., 2.4(1), at 91. ___ Here, the district court explicitly disclaimed any intent to apply the equitable doctrine of laches as a bar to DACO's motion. See TPR II, 862 F. Supp. at 702 n.8. In its ___ _______ search for the case's equitable epicenter, however, the court was fully entitled to use delay as one of a number of factors bearing on the outcome. This is precisely what Judge Fuste did, and there is no principled basis for DACO's suggestion that he mouthed the vocabulary of equitable balancing as a means of surreptitiously injecting a barred laches defense into the case. Indeed, in considering DACO's delay as part of the equitable balance, the judge merely honored the precept that the government, when it seeks an equitable remedy, "is no more immune to the general principles of equity than any other litigant." 21 United States v. Second Nat'l Bank, 502 F.2d 535, 548 (5th Cir. _____________ _________________ 1974). DACO also contends that the district court clearly erred in finding prejudicial delay. This contention is unpersuasive. The evidence shows that DACO first raised the refund issue in its June 1989 interim order. DACO did nothing further on this score until ten months later, when it sent letters to the wholesalers conveying its "preliminary views" on the suitability of refunds. DACO then dropped the refund issue like a hot potato and did not resurrect it until August 20, 1992, when the then-Secretary, Guillermo Mojica Maldonado (Mojica), announced at a press conference that he planned to seek refunds from the wholesalers. All told, DACO waited three years after this court vacated the injunction to commit itself to the pursuit of restitution. DACO does not dispute the accuracy of this chronology, but takes vigorous exception to the court's conclusion that "[t]his type of stopping and starting, delaying and then proceeding[,] must be considered prejudicial to the wholesalers, who had to run their business with the threat of multimillion dollar refunds occasionally flaring up and then disappearing." TPR II, 862 F. Supp. at 707. DACO offers a myriad of excuses for ______ its procrastination; it intimates that, as a government agency, torpor is to be expected; it claims to have undergone numerous changes in staff and leadership during the period; and it says that its attention was diverted because of ongoing litigation 22 over its proposed 13 GPM that lasted until March of 1991. The district court dismissed these excuses as lame. We, too, find them insufficient. Government agencies, like private corporations, have an obligation to conduct their affairs in a reasonably efficient manner. See Potomac Elec. Power Co. v. ICC, 702 F.2d 1026, 1034 ___ ________________________ ___ (D.C. Cir. 1983) (warning that "excessive delay saps the public confidence in an agency's ability to discharge its responsibilities"). An entity that chooses to indulge inefficiencies cannot expect to be granted special dispensations. If "[t]he mills of the bureaucrats grind slow," United States v. _____________ Meyer, 808 F.2d 912, 913 (1st Cir. 1987), then the agency, having _____ called the tune, must pay the piper. See, e.g., United States v. ___ ____ _____________ Baus, 834 F.2d 1114, 1123 (1st Cir. 1987) (holding that the ____ government "should not be allowed by words and inaction to lull a party into a false sense of security and then by an abrupt volte- face strip the party of its defenses"); Cutler v. Hayes, 818 ______ _____ F.2d 879, 896 (D.C. Cir. 1987) (explaining that, when an administrative agency loiters, "the consequences of dilatoriness may be great"). By like token, neither government agencies nor private employers can escape responsibility for the exercise of due diligence merely because of employee turnover. Department heads and other key personnel may come and go, but the institution must endure. See Cutler, 818 F.2d at 896-97. ___ ______ Similarly, preoccupation with other litigation is hardly a reason for extreme delay. See, e.g., Mendez v. Banco Popular, 900 F.2d ___ ____ ______ _____________ 23 4, 6-7 (1st Cir. 1990) (district court did not abuse discretion in failing to grant extension of time based on attorney's busy trial calendar); Pinero Schroeder v. Federal Nat'l Mortgage _________________ ________________________ Ass'n, 574 F.2d 1117, 1118 (1st Cir. 1978) (same). And in all _____ events, litigation ending in early 1991 cannot credibly explain __________ why DACO took no firm position until August 1992. ___________ We will not wax longiloquent. It is trite, but true, that equity ministers to the vigilant, not to those who sleep upon their rights. See, e.g., Sandstrom v. Chemlawn Corp., 904 ___ ____ _________ _______________ F.2d 83, 87 (1st Cir. 1990). Given the uncontradicted evidence, we believe that the district court acted lawfully in ruling that unreasonable delay on DACO's part militates against relief. 4. Bad Faith. It is old hat that a court called upon 4. Bad Faith. _________ to do equity should always consider whether the petitioning party has acted in bad faith or with unclean hands. See Precision ___ _________ Instrument Mfg. Co. v. Automotive Maintenance Mach. Co., 324 U.S. ___________________ ________________________________ 806, 814 (1945) (explaining that the doctrine of unclean hands "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief"); see also Dobbs, supra, at 109; see generally K- ___ ____ _____ _____ ___ _________ __ Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 910-12 (1st __________ _____________________ Cir. 1989) (discussing "unclean hands" doctrine in relation to the equitable maxim that "he who seeks equity must do equity"). But even though equitable doctrines are renowned for their elasticity, they are not without all limits. The doctrine of unclean hands only applies when the claimant's misconduct is 24 directly related to the merits of the controversy between the parties, that is, when the tawdry acts "in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication." Keystone ________ Driller Co. v. General Excavator Co., 290 U.S. 240, 245 (1933).  ___________ _____________________ In the case at bar, the test was met. The district court found pervasive evidence of bad faith on DACO's part, directly related to the core elements of the dispute sub judice. ___ ______ See TPR II, 862 F. Supp. at 707. Although DACO brands this ___ ______ finding clearly erroneous and worse for instance, DACO claims, without a shred of record support, that the finding is "tinged with political, rather than legal, analysis," Appellants' Brief at 37 we believe that there is ample evidence in the record to support the district court's perspective. In making its finding of bad faith, the lower court relied heavily on two occurrences. The court found that, in the spring of 1986, while the government of Puerto Rico was pondering the advisability of an excise tax, see supra pp. 3-4, high-level ___ _____ officials, including the President of the Senate and the Secretary of State, summoned executives of the three appellees to a series of private audiences. The court further found that "the wholesalers were warned that they should cooperate with the government in the implementation of the new tax by refraining from further lowering gas prices, so that the government could achieve revenue from the tax . . . ." TPR II, 862 F. Supp. at ______ 695. The discussions were blunt. To offer one illustration, Jose 25 Luis Blanco, Esso's operations manager at the time, testified that the Secretary of State uttered "a very strong threat" to the effect that, if Esso failed to acquiesce in the government's strategy, the company's continued existence in Puerto Rico would be "very difficult." DACO claims that these thinly veiled minations had no bearing on margin regulations imposed well after the excise tax was enacted. This claim is disingenuous. Past is prologue, and the district court plausibly could find as it did that the 1986 meetings were part of the same overall course of conduct that led to the push for restitution six years later. After all, the meetings involved the same principals and the same subject matter, and, with the benefit of hindsight, can be viewed as a harbinger of things to come. On this basis, the district court did not err in concluding that the 1986 meetings were relevant to DACO's good faith (or lack thereof) in seeking restitution some years thereafter. This is particularly true in that, shortly after the government "suggested" that the wholesalers refrain from lowering gasoline prices, DACO attempted to justify its regulation of GPMs on the ground that the wholesalers' prices were too high. Thus, in effect, DACO bore a degree of responsibility for creating the "excess profits" that it later attempted to recapture, first via the excise tax, and then by dint of the motion for restitution. The second pillar of the court's conclusion lacks the dramatic impact of these strong-arm tactics, but affords a closer temporal link. The court thought 26 that the actions of Secretary Mojica in and around 1992 betokened bad faith. See TPR II, 862 F. Supp. at 707. At trial, Mojica ___ ______ admitted that he had chosen the 8.6 figure based not on any economic rationale, but as a stratagem to enhance DACO's negotiating position. The district court found this behavior "irresponsible." Id. And Secretary Mojica made a bad situation ___ worse by issuing a remedial order that singled out Texaco, Esso, and Shell, whilst leaving unscathed a number of other wholesalers who had exceeded the 8.6 margin. The lower court found that these efforts to exact restitution from the appellees and from no other similarly situated wholesalers smacked of bad faith, see id., and DACO can point to no evidence that refutes the ___ ___ implication of selective targeting in retaliation for the appellees' active opposition to the government's desires. We think that the record as a whole corroborates the district court's determination that the 8.6 figure was chosen as a crude club to bludgeon the wholesalers into a settlement, without regard for the economic realities of the petroleum industry. Indeed, the nisi prius roll is replete with evidence suggesting this unhappy conclusion. For one thing, DACO's chief economist, Carlos Lasanta, testified that he had advised his superiors that the 8.6 margin was economically inadequate, yet DACO persisted in its plan. For another thing, Secretary Mojica testified that he issued the remedial order and set the ceiling 27 without even pausing to review the administrative record.6 In sum, the grounds relied upon by the district court pass muster. Because the remedy of restitution is premised on the concept of unjust enrichment, DACO's actions both in 1986 and in 1992 sabotage its present attempt to seize the high ground by asserting that the wholesalers took unfair advantage of the erroneous injunction. Hence, we are unwilling to disturb the court's determination that DACO's actions were tinged with bad faith. 5. Reliance. A court considering a restitutionary 5. Reliance. ________ remedy may properly weigh the factor of reliance in its equitable balancing. See Moss v. Civil Aeronautics Bd., 521 F.2d 298 (D.C. ___ ____ _____________________ Cir. 1975), cert. denied, 424 U.S. 966 (1976). In doing so here, _____ ______ the court found that the statements of two different Secretaries (Ortiz and Ocasio) led the wholesalers to believe that DACO regarded their margins "to be reasonable, and therefore, that restitution of such reasonable profits would not later be demanded." TPR II, 862 F. Supp. at 708. Moreover, the _______ wholesalers convinced the court that they justifiably relied on  ____________________ 6DACO asserts that, because the remedial order "was only the starting point for [its] consideration of the appropriate level of refunds," the terms of the order "cannot rationally be considered evidence of bad faith." Appellants' Brief at 38-39. This ipse dixit does not withstand scrutiny. When Secretary ____ _____ Mojica announced the promulgation of the remedial order, he presented the 8.6 figure not as a guidepost to a determination of the eventual measure, but as a fait accompli. Moreover, the order itself described "a maximum profit margin of 8.6 cents per gallon" as "conclusive and undebatable." DACO retreated from this figure only after the wholesalers sought judicial protection. 28 those statements in formulating their business plans. See id. ___ ___ The record is consistent with these findings. It is not farfetched to think that Secretary Ortiz's statements, see, ___ e.g., supra p.14, could have lulled the wholesalers into a false ____ _____ sense of security. See, e.g., Insurance Co. v. Mowry, 96 U.S. ___ ____ _____________ _____ 544, 547 (1877) ("A representation as to the future can be held to operate as an estoppel . . . where it relates to an intended abandonment of an existing right, and is made to influence others, and by which they have been induced to act."). Then, too, the wholesalers adduced explicit evidence of reliance, credited by the trier. A number of executives testified that they took the Secretary's statements regarding the reasonableness of their firms' profit margins at face value, and authorized investments in Puerto Rico that they would not otherwise have approved. We cannot hold that the court clearly erred in detecting detrimental reliance on these facts. See, e.g., ___ ____ Cumpiano, 902 F.3d at 152 ("Where there are two permissible views ________ of the evidence, the factfinder's choice between them cannot be clearly erroneous.") (quoting Anderson, 470 U.S. at 573-74). ________ The court's finding of detrimental reliance is bolstered by another circumstance. When Judge Fuste issued the injunction, DACO could have but did not ask him to require a bond or an escrow account. See Inland Steel Co. v. United ___ __________________ ______ States, 306 U.S. 153, 156-57 (1939) (holding that court acted ______ lawfully in conditioning injunction against ICC on establishment of escrow account to defray possible restitutionary obligations). 29 Although a bond or escrow fund is not a prerequisite for restitution in cases involving injunctions, see, e.g., Newfield ___ ____ ________ House, Inc. v. Mass. Dep't of Pub. Welfare, 651 F.2d 32, 39 n.12 ___________ ____________________________ (1st Cir.) (holding that "the need for a[n injunction] bond is limited to the recovery of damages and has no application to a claim of restitution of amounts subsequently found to have been undue"), cert. denied, 454 U.S. 1114 (1981), a court called upon _____ ______ to perform equitable balancing may nonetheless weigh the absence of a bond or other fund as a factor in its equitable assay. See ___ Moss, 521 F.2d at 314; see also Thompson v. Washington, 551 F.2d ____ ___ ____ ________ __________ 1316, 1321 (D.C. Cir. 1977). This is the music to which the district court marched. See TPR II, 862 F. Supp. at 708. Just ___ ______ as the existence of a bond or other fund would have undercut any claim of detrimental reliance, so, too, their absence lends credence to the wholesalers' lament. 6. Public Interest. It cannot be gainsaid that a 6. Public Interest. ________________ court asked to dispense equitable remediation should give serious consideration to the public interest. See Morgan, 307 U.S. at ___ ______ 194 ("It is familiar doctrine that the extent to which a court of equity may grant or withhold its aid, and the manner of moulding its remedies may be affected by the public interest involved."); Rosario-Torres, 889 F.2d at 323 (similar). Here, the district ______________ court found that the public interest would be disserved by granting restitution. The court reasoned "that investment in Puerto Rico by the gasoline companies would be curtailed, or that Esso, Texaco and/or Shell [might] even leave the island 30 completely, resulting in a possible loss of jobs and competitiveness in the wholesaling market." TPR II, 862 F. Supp. ______ at 708. At trial, DACO made no effort to contradict the wholesalers' testimony on this point. In this venue, it likewise abjures any challenge to the testimony's relevance. Instead, DACO complains about the district court's related statement that DACO had "failed to propose a cogent plan to restore losses" to the Puerto Rico motorists who bore the brunt of the alleged overcharges. Id. In DACO's eyes, depositing a restitutionary ___ award into the commonwealth's general fund comprises an entirely satisfactory trickle-down substitute for the court's envisioned plan of direct payments to motorists. Once again, DACO's fascination with a single tree obscures its view of the forest. The district court's rescript, properly read, does not hold that depositing refunds into the commonwealth's coffers is repugnant to the public interest in an absolute sense. The court's point is quite different. Judge Fuste expressed the belief that the clear harm to the Puerto Rico economy that would result from levying a huge restitution award outweighed the benefit accruing from refunds that would not directly compensate the injured victims. Though such a judgment call may be arguable, we are unprepared to say that it represents a clearly erroneous assessment of the evidence. Cf., e.g., Moss, ___ ____ ____ 521 F.2d at 308 ("The bite which is effectively taken from future earnings by a recovery fund may in turn impair the health of the 31 industry, to the disadvantage of the fare-payers themselves."). 7. Recapitulation. We have fashioned a tried-and-true 7. Recapitulation. ______________ framework for gauging claimed abuses of discretion: In making discretionary judgments, a district court abuses its discretion when a relevant factor deserving of significant weight is overlooked, or when an improper factor is accorded significant weight, or when the court considers the appropriate mix of factors, but commits a palpable error of judgment in calibrating the decisional scales. United States v. Roberts, 978 F.2d 17, 21 (1st Cir. 1992); accord _____________ _______ ______ Dopp, 38 F.3d at 1253 (listing other cases). Here, the record ____ discloses that the district court made a careful appraisal within the contours of this tested framework. DACO has failed to show that the court, in performing this appraisal and arriving at its judgment, overlooked appropriate factors, considered inappropriate factors, or made a detectable mistake in weighing the evidence. Mindful, as we are, that "[t]he very nature of a trial judge's interactive role assures an intimate familiarity with the nuances of ongoing litigation a familiarity that appellate judges, handicapped by the sterility of an impassive record, cannot hope to match," Dopp, 38 F.3d at 1253, we decline ____ to place a heavy appellate thumb on the scales of justice and thereby upset the trier's delicate balancing of the competing equities in this unusual situation. III. OTHER ISSUES III. OTHER ISSUES In addition to its assault upon the district court's equitable determination, DACO mounts a more narrowly targeted 32 offensive on a second front. In this regard, DACO assigns error to a series of discovery rulings that together forced the disclosure of eighteen agency documents, mostly in the nature of correspondence between DACO (or other government representatives) and DACO's outside counsel. This attempt to open a second front is little more than a diversionary sortie, poorly outfitted and easily repulsed. We set the stage. In ordering disclosure as a subset of a broader order that DACO turn over the "complete administrative file" in the case to the wholesalers, the court determined that these writings were not entitled to protection under either the attorney-client privilege or the deliberative process privilege. We consider the district court's privilege rulings cognizant that, "[b]ecause we regard the existence of a privilege as a factual determination for the trial court . . . the district court's finding of no privilege can be overturned only if clearly erroneous." United States v. Wilson, 798 F.2d _____________ ______ 509, 512 (1st Cir. 1986); accord United States v. Bay State ______ ______________ _________ Ambulance & Hosp. Rental Serv., Inc., 874 F.2d 20, 27 (1st Cir. _____________________________________ 1989). Since local law does not supply the rule of decision anent DACO's claim for restitution, federal common law governs our analysis of the wrangling over privileges. See Fed. R. Evid. ___ 501. A. Attorney-Client Privilege. A. Attorney-Client Privilege. _________________________ The Supreme Court has described the attorney-client privilege as "the oldest of the privileges for confidential 33 communications known to the common law." Upjohn Co. v. United ___________ ______ States, 449 U.S. 383, 389 (1981). The privilege protects "not ______ only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." Id. at 390. The purpose of the ___ privilege is "to encourage full and frank communications between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." Id. at 389. ___ In its unpublished order requiring revelation of the eighteen documents, the district court rejected DACO's claim of attorney-client privilege on two grounds. First, the court found that DACO waived any such privilege because four of the documents "were inadvertently shown to Texaco's legal representatives" during their initial review of the administrative file.7 We examine the underpinnings of this ruling.  It is apodictic that inadvertent disclosures may work a waiver of the attorney-client privilege. See, e.g., In re Sealed ___ ____ ____________ Case, 877 F.2d 976, 979-80 (D.C. Cir. 1989); In re Grand Jury ____ _________________ Proceedings, 727 F.2d 1352, 1356 (4th Cir. 1984); see also ___________ ___ ____  ____________________ 7At trial, the district court described how this bevue occurred: You people [DACO] told them [Texaco's representatives], here is a room full of papers, you can take a look at them. They looked at them, they found them and then when you discovered that they had seen them and that they wanted copies of those, then you came running here seeking an order. 34 Allread v. City of Grenada, 988 F.2d 1425, 1434 (5th Cir. 1993). _______ _______________ Thus, it beggars credulity to argue that the district court erred in entering a turnover order anent the four documents to which Texaco's representatives previously had been exposed. Apart from that fairly obvious conclusion, however, it also must be recognized that inadvertent disclosures can have a significance that transcends the documents actually disclosed. In general, a waiver premised on inadvertent disclosure will be deemed to encompass "all other such communications on the same subject." Weil v. Investment/Indicators, Research & Mgmt., ____ ________________________________________ Inc., 647 F.2d 18, 24-25 & n.13 (9th Cir. 1981); accord In re ____ ______ _____ Sealed Case, 877 F.2d at 980-81; see also 4 J.M. Moore & J.D. ___________ ___ ____ Lucas, Moore's Federal Practice 26.11[2], at 26-185 (1994). _________________________ Since DACO does not contend that the four carelessly unveiled documents concerned a different topic than the other fourteen documents in the group, we think that, under the deferential standard of review applicable to privilege questions, the district court had an adequate basis for disregarding the attorney-client privilege vis-a-vis all eighteen documents. The district court's alternative ground for ordering disclosure is equally solid. The court found as a fact, after in camera inspection of the disputed documents, that outside counsel had become an integral part of the adjudicative decisionmaking process. Based on this factual finding, the court ruled that the attorney-client privilege did not apply because, when an administrative agency engaged in an adjudicative function 35 delegates its responsibilities to outside counsel, then the work product generated by the firm is part of the adjudicative process itself and, hence, beyond the reach of the attorney-client privilege. DACO resists this analysis, pontificating that such a doctrine "would render the attorney-client privilege meaningless where state or local governments employ counsel and rely on their advice." Appellants' Brief at 47. But this trumpeting misapprehends the tenor of the district court's ruling. The attorney-client privilege attaches only when the attorney acts in that capacity. See Bay State Ambulance, 874 F.2d at 27-28; ___ ____________________ Wilson, 798 F.2d at 512; United States v. United Shoe Mach. ______ ______________ __________________ Corp., 89 F. Supp. 357, 358-59 (D. Mass. 1950). Here, the _____ district court found, in substance, that DACO delegated policymaking authority to its outside counsel to such an extent that counsel ceased to function as lawyers and began to function as regulators. Therefore, DACO could not invoke the attorney- client privilege in connection with the documents at issue. We cannot term this finding clearly erroneous. The record shows that DACO's counsel had, in fact, drafted remedial orders that DACO adopted verbatim; that Dr. Logan, an employee of DACO's counsel, was the "putative author of the [1989] 13-cent regulation," TPR II, 862 F. Supp. at 706; and that counsel had ______ developed adjudicative data that the agency later reissued as its own. Nor can we term the finding unsupported in law. See Mobil ___ _____ Oil Corp. v. Department of Energy, 102 F.R.D. 1, 9-10 (N.D.N.Y. _________ _____________________ 36 1983) (rejecting claim of attorney-client privilege where proponent failed to show that lawyers were acting in their capacities as attorney advisors rather than as regulatory decisionmakers); Coastal Corp. v. Duncan, 86 F.R.D. 514, 521 (D. _____________ ______ Del. 1980) (similar; observing that such a showing is particularly important in a situation in which "attorneys function primarily as policy-makers rather than as lawyers"). B. Deliberative Process Privilege. B. Deliberative Process Privilege. ______________________________ DACO also takes exception to the district court's ruling that the deliberative process privilege did not exempt the same cache of documents from production. The deliberative process privilege "shields from public disclosure confidential inter-agency memoranda on matters of law or policy." National ________ Wildlife Fed'n v. United States Forest Serv., 861 F.2d 1114, 1116 ______________ __________________________ (9th Cir. 1988). The privilege rests on a policy of affording reasonable security to the decisionmaking process within a government agency. See NLRB v. Sears, Roebuck & Co., 421 U.S. ___ ____ _____________________ 132, 150 (1975). The Supreme Court has restricted the deliberative process privilege to materials that are both predecisional and deliberative. See EPA v. Mink, 410 U.S. 73, 88 (1973). In other ___ ___ ____ words, to qualify for the privilege, a document must be (1) predecisional, that is, "antecedent to the adoption of agency policy," and (2) deliberative, that is, actually "related to the process by which policies are formulated." National Wildlife, _________________ 861 F.2d at 1117 (citation omitted). Because the deliberative 37 process privilege is restricted to the intra-governmental exchange of thoughts that actively contribute to the agency's decisionmaking process, factual statements or post-decisional documents explaining or justifying a decision already made are not shielded. See Sears, Roebuck, 421 U.S. at 151-52; Mink, 410 ___ ______________ ____ U.S. at 88; see also Developments in the Law Privileged ___ ____ ________________________________________ Communications, 98 Harv. L. Rev. 1450, 1620-21 (1985). ______________ Even if a document satisfies the criteria for protection under the deliberative process privilege, nondisclosure is not automatic. The privilege "is a qualified one," FTC v. Warner Communications Inc., 742 F.2d 1156, 1161 (9th ___ __________________________ Cir. 1984), and "is not absolute." First Eastern Corp. v. ____________________ Mainwaring, 21 F.3d 465, 468 n.5 (D.C. Cir. 1994). Thus, in __________ determining whether to honor an assertion of the privilege, a court must weigh competing interests. See id.; see also ___ ___ ___ ____ Developments, supra, at 1621 (noting that courts asked to apply ____________ _____ the privilege must engage in "ad hoc balancing of the evidentiary need against the harm that may result from disclosure"). At bottom, then, the deliberative process privilege is "a discretionary one." In re Franklin Nat'l Bank Sec. Litig., _______________________________________ 478 F. Supp. 577, 582 (E.D.N.Y. 1979). In deciding how to exercise its discretion, an inquiring court should consider, among other things, the interests of the litigants, society's interest in the accuracy and integrity of factfinding, and the public's interest in honest, effective government. See Warner ___ ______ Communications, 742 F.2d at 1162. Consequently, "where the ______________ 38 documents sought may shed light on alleged government malfeasance," the privilege is routinely denied. Franklin, 478 ________ F. Supp. at 582; see also Bank of Dearborn v. Saxon, 244 F. Supp. ___ ____ ________________ _____ 394, 401-03 (E.D. Mich. 1965) ("the real public interest under such circumstances is not the agency's interest in its administration but the citizen's interest in due process"), aff'd, 377 F.2d 496 (6th Cir. 1967).  _____ Assuming, arguendo, that the documents at issue are both predecisional and deliberative a matter on which we need not opine the district court's rejection of the deliberative process privilege is nevertheless impervious to DACO's attack. The court supportably found that the wholesalers had made a "strong showing" of arbitrariness and discriminatory motives on DACO's part. Given the discretionary nature of the deliberative process privilege, and the district court's warranted conclusion that DACO acted in bad faith over a lengthy period of time, see ___ supra Part II(D)(4), we resist the urge to tinker with the _____ court's determination that the wholesalers' interest in due process and fairness outweighed DACO's interest in shielding its deliberations from public view.8  ____________________ 8We note in passing that the district court's waiver analysis, made in connection with DACO's claim of attorney-client privilege, see supra Part III(A), arguably applies to the ___ _____ deliberative process privilege as well. Because the privilege lacks vitality here, we will not pursue the question of waiver beyond noting that it is apparently unsettled. Compare, e.g., _______ ____ Clark v. Township of Falls, 124 F.R.D. 91, 93-94 (E.D. Pa. 1988) _____ _________________ (holding that a municipality waived any claim of executive privilege by prior disclosure) with, e.g., Redland Soccer Club, ____ ____ ____________________ Inc. v. Department of Army, ___ F.3d ___, ___ (3d Cir. 1995) ____ ___________________ [1995 WL 289681 at *25] (holding that inadvertent disclosure of 39 C. Harmless Error. C. Harmless Error. ______________ We add a postscript to our discussion of the district court's discovery rulings. In all events, we do not believe that the district court's rejection of DACO's privilege claims affected DACO's substantial rights. Any error was, therefore, harmless. See Fed. R. Civ. P. 61 (explaining that a court "must ___ disregard any error or defect in the proceeding which does not affect the substantial rights of the parties"). In denying DACO's claim for restitution, the district court mentioned only one of the eighteen challenged documents (a June 1989 memorandum from DACO's outside counsel to Governor Hernandez Colon). See TPR II, 862 F. Supp. at 705. The court ___ ______ cited this memorandum as additional support for its factual finding that contemporaneous events, rather than a long-term commitment to regulation, spurred DACO's actions in June of 1989. The memorandum comprised only a small fraction of the evidence on which the court relied in reaching this conclusion. See supra ___ _____ Part II(D)(1) (limning other evidence). It is axiomatic that a litigant's substantial rights are not offended by the admission of cumulative evidence. See, e.g., Doty v. Sewall, 908 F.2d ___ ____ ____ ______ 1053, 1056 (1st Cir. 1990); Garbincius v. Boston Edison Co., 621 __________ _________________ F.2d 1171, 1175 (1st Cir. 1980); deMars v. Equitable Life Assur. ______ _____________________ Soc'y, 610 F.2d 55, 62 (1st Cir. 1979). _____ IV. CONCLUSION IV. CONCLUSION  ____________________ documents did not give rise to waiver of deliberative process privilege).  40 We need go no further. There are neither precise answers nor perfect solutions when a court is forced to deal with the shadowy world of what might have been. Where, as here, the customary deference accorded to the trial court as factfinder is augmented by due respect for that court's equitable discretion, appellate courts should hesitate to meddle. In this instance, the judge, who had handled the case from its inception, weighed and balanced the equities, and juxtaposed the parties' rights with painstaking care. Thus, whether or not we, if writing on a pristine page, might have concluded otherwise, we are unable to tease an abuse of discretion out of what is quintessentially a judgment call. Affirmed. Affirmed. ________ 41